In the Matter of the Application of the City of New York, Relative to Acquiring Title to the Elevated Railroad Structures, etc., of the Manhattan Railway Company, or by Whomsoever Owned, in East Forty-second Street, Constituting the Existing Forty-second Street Spur, in the Borough of Manhattan, City of New York, and Also to Acquire the Right to Extinguish All Rights, etc., of Said Manhattan Railway Company, or by Whomsoever Owned, to Construct, Maintain and Use Said Elevated Railroad Structures, etc.

Supreme Court, New York County, April 13, 1926.

Eminent domain — street railways — damages upon condemnation of elevated railroad spur in city of New York — tracks, structures, stations and appurtenances of railroad company removed and rights, easements and franchises condemned under order of Public Service Commission, pursuant to statute (Laws of 1917, chap. 788, as amd.) — rules stated for valuation of franchise, public and private easements in street, structures, and other rights and property of railroad company.

In condemnation proceedings instituted by the city of New York to acquire title to the elevated railroad structure of the Manhattan Railroad Company in East Forty-second street, New York city, constituting the existing " East

Forty-second Street Elevated spur," the tracks, structures, stations and appurtenances of which have been removed and the rights, easements and franchises belonging to the railroad company condemned under authority of the Public Service Commission pursuant to statute (Laws of 1917, chap. 788, as amd.), the value of the franchise must be determined upon the basis of the present and prospective earning power of the spur considered as part of the Third Avenue system of the company.

The public easement of the railroad to the occupancy of the street and of interference with light, air and access of abutting property owners cannot be considered as a separate entity and valued accordingly because the franchise having been granted only for the maintenance and operation of the railroad, the railroad company secured no rights in the street beyond the right to erect, operate and maintain an elevated railroad.

While the public easements may be considered as one of the elements of value of the franchise, they cannot be measured by any use to which the city may adapt them. Nor should the space be valued upon the basis of charges made by the city of New York to private owners for the occupation of space by overhead structures of any character such as covered or open platforms connecting buildings, street viaducts, and structures of such character.

If the spur has any value as a feeder to the main system of claimant's railroad, either present or potential, the railroad is entitled to compensation therefor, since the spur, siding and switches of the railroad are all part of a going system. A strict application of the net earnings rule is not proper because of the difficulty of ascribing to such part its proper share of income. However, mere lack of cogent proof showing such part to be income producing is not necessarily a bar to the finding of value. All other elements including present earning power and reasonable prospective value must be considered.

In so far as the so-called private easements of light, air and access exist in the railroad company they must be considered separate and distinct from the franchise owned by it, for the reason that the company never took or gained possession of the easements formerly held by the abutting property owners consisting of the right of said owners to have the public highway remain free and unobstructed so that the light, air and access normally appurtenant to their property should in no way be diminished. But as the railroad has no abutting property and possesses only such property as it has in the street, it cannot be said to own any such easements.

It is immaterial whether or not condemnation has resulted from an appropriation of the property by the city or by the latter having destroyed the property. Property may be taken in condemnation by mere destruction. Moreover, whether the right be regarded as an easement appurtenant or in gross, or a right to possession for the purpose of extinguishment and enjoyment, it is a property right which has become vested in the railroad and which it is entitled to enjoy in perpetuity.

The value of the structure should be determined by whether or not it is available solely for railroad purposes or whether it is available for any other purpose in the hands of the railroad or its grantees. However, the railroad obtained the right to destroy the easements for railroad purposes solely, and acquired only a a qualified title under the order of confirmation by which it took the property, since said order authorized the railroad " to have and hold the same * * * for the purpose of maintaining and operating an elevated railroad * * * the estate taken in such land being limited to the right to use the same to maintain * * * and operate a railroad thereon * * * so long as the aforesaid street is used and maintained as a public street * * *."

In determining the valuation of the various species of property involved herein, the same considerations are to be regarded as in a sale of property between private parties. The owner is entitled to just compensation and to have considered every element that can fairly enter into the question of valuation. Such value is dependent on and to be determined by the specific facts and circumstances of each case. But whatever such value, it is the value to the owner or condemnee and not to the condemnor.

But because of the exceptional circumstances here present, great latitude in the reception and consideration of evidence should prevail; consequently by reason of the fact that the property has no ascertainable market value, its value must be determined by a consideration of such elements as original cost, replacement value and earning capacity. Due weight should be given to each, but none must be deemed controlling. The court, too, is entitled to consider what the property, including the right to impair these easements, originally cost, what it would cost to-day, depreciation, the earning power of the spur, and its value as a component part of the Third Avenue system.

The value of the so-called private easements in possession of the claimants must be predicated on the fair market value of all uses and purposes available to them or their grantees, but except in the case of voluntary conveyances, claimants hold the right to the impairment of the abutting property owners' easements of light, air and access solely for railroad purposes.

The value of the property, in so far as to what future use the city of New York may put it to for street purposes, is so speculative in character that it cannot be regarded as having any value for the purpose of this proceeding. But because the right in the possession of the railroad company was limited to the purposes indicated, it does not follow that it is without value. Its acquisition was essential to the maintenance and operation of the elevated system.

Taking into consideration the original and present cost of the acquisition, the fair market value to the railroad of the right in perpetuity to the maintenance and operation of its system and the impairment in connection therewith of easements of light, air and access of abutting property owners is $750,000.

Furthermore, claimants are entitled to be compensated on the basis of the fair reproduction value of the physical structures removed, but the value must be predicated largely upon structural value.

An allowance also should be made for the cost of reconstruction of the station at Forty-second street and Third avenue rendered necessary by the changes ordered by the Transit Commission.

The stairway leading to the sidewalk in front of the Grand Central Station at the Park Avenue station of the spur was legally maintained, and if injunctive relief were necessary, claimants would be entitled to relief, but the structure having been removed, the question involved in an action in which the claimants sought to enjoin the city from removing it becomes academic.

PROCEEDINGS by the city of New York to acquire title to certain elevated railroad property in East Forty-second street, borough of Manhattan, city of New York.

*George P. Nicholson, Corporation Counsel [L. Howell LaMotte Assistant Corporation Counsel, of counsel], for the City of New York.*

*James L. Quackenbush [J. Osgood Nichols of counsel], for the Interborough Rapid Transit Company.*

*Murray, Aldrich & Roberts [William Roberts and William Dean Embree of counsel], for the Manhattan Railway Company.*

*George Welwood Murray, for the Equitable Trust Company of New York.*

*Davies, Auerbach & Cornell [Edward Cornell and Brainard Tolles, of counsel], for the Central Union Trust Company.*

*William H. Page, for the Forty-second Street Association, as amicus curiæ.*

JAMES O'MALLEY, J. This is a condemnation proceeding instituted by the city of New York to acquire title to the property of the Manhattan Railway Company within the lines of East Forty-second street, between Park and Third avenues. The property involved, briefly described, is the so-called " East 42nd Street Elevated Spur," hereinafter referred to as the spur. Four claimants have appeared, namely, the Manhattan Railway Company, owner; the Interborough Rapid Transit Company, lessee; and the Central Union Trust Company of New York and the Equitable Trust Company of New York, holders and trustees of the first and second mortgages, respectively, of the Manhattan Railway Company. By consent of claimants, however, but one award is required, the amount of which is to be apportioned among them by agreement.

In addition it is to be noted that there also appeared in the proceeding the Forty-second Street Association, composed of various abutting property owners, through their counsel as *amicus curiæ.*

At the outset it is to be observed that among the numerous questions of law involved one is wholly novel and of unusual interest and importance to the claimants and the city. It relates to the nature and character of the claimants' interest in certain street easements, particularly the so-called private easements of light, air and access, as distinguished from claimants' public easements in the street, and their value, if any, to the railroad. This legal phase has never before been presented, at least in a condemnation proceeding, and as both parties agree that it is within the bounds of possibility that eventually all elevated lines in the city may have to be taken in condemnation, this proceeding obviously may become the forerunner of numerous cases. Indeed, another similar proceeding for the condemnation of the Sixth avenue elevated structure between Fifty-third and Fifty-ninth streets has already been instituted and the trial thereof formally begun before me. It has been adjourned, however, until a decision by the court of last resort can be had herein. It is obvious, there-

fore, that the ultimate decision herein must establish a rule for the future guidance of the parties in interest.

In the trial of the case the aim has been to permit a broad latitude in the introduction of evidence, in order that the higher courts may have before them all relevant facts upon which to base a decision in the event that an erroneous rule of damage is here adopted.

Unlike the ordinary condemnation, this proceeding is based upon special legislative acts, both State and municipal. The basic statute was enacted by chapter 788 of the Laws of 1917. It vested the Public Service Commission with power to "authorize the removal by Manhattan Railway Company of the existing tracks, structure, station and appurtenances on its railroad on East Forty-second street, in the borough of Manhattan, in the city of New York, without prejudice to any franchise of said company to construct, maintain or operate the same, or the right or obligation of said company to *restore* the same in case such restoration shall be deemed to be necessary or convenient for the public service." (Italics mine.)

Such authority was to be by certificate granted to the railway company with the approval of the board of estimate and apportionment and to be " *accepted* " by the railway company. In addition the certificate was to provide the terms and conditions for the removal or restoration and the cost thereof. Owing to the opposition of the railway company to the removal of the spur, however, nothing was accomplished under this permissive statute as originally enacted.

The powers of the Public Service Commission with respect to the subject-matter of the original act were considerably extended by the amendment of 1919 (Laws of 1919, chap. 611). This amendment sought to remedy the defects in the original act by substituting a mandatory in place of a mere permissive remedy. It vested the Commission with power to determine whether the maintenance of the spur was necessary and convenient for the public service, or, if necessary and convenient, whether it constituted an obstruction or an impediment to the public use of the street. Such investigation by the Commission was to be instituted upon the request of the board of estimate and apportionment, in the event that the certificate required under the original act had not been made, or no agreement with the railway company had been reached by October 1, 1919.

Following the enactment of the amendment and pursuant to a resolution of the board of estimate and apportionment, the Commission held hearings and determined: (1) That the spur

was no longer necessary or convenient for the public service; and (2) that it constituted an impediment and obstruction to the public use of the street, and subsequently issued its certificate to this effect as required by the amendment of 1919. The pertinent provisions of the amendment with respect to said certificate and its effect, and the authority of the board of estimate and apportionment thereunder are as follows: "Upon making of such certificate by said commission the said city shall have the right to condemn and remove from the street, such tracks, structure, station and appurtenances or such unit or portion thereof as may have been determined by said commission to be no longer necessary and convenient to the public service or an impediment or obstruction to the public use of the street. Whenever the said board of estimate and apportionment determine it to be necessary or advisable to remove from the street such tracks, structure, station and appurtenances or such unit or portion thereof as shall have been determined by said commission, the said city shall also condemn the rights, easements and franchises of the said Manhattan Railway Company to construct, maintain, operate or use said tracks, structure, station and appurtenances or any unit or portion thereof."

There was further provision for conducting the proceeding for condemnation in accordance with the usual provisions of the Greater New York charter relating to condemnation.

On September 30, 1921, the board of estimate and apportionment, in pursuance of the aforesaid acts of the Legislature and of the Greater New York charter, as amended, adopted a resolution declaring that it deemed it necessary for the public interest to condemn and remove the tracks, structures, station and appurtenances and to condemn the rights, easements and franchises of the Manhattan Railway Company to construct, maintain, operate or use said tracks, structures, station and appurtenances, and that the compensation to be made should be ascertained and determined by the Supreme Court without a jury, and requested the corporation counsel to apply to the Supreme Court to have said compensation so ascertained and determined and to have the court assess the costs and expense upon the real property within the area of assessment determined by the board of estimate and apportionment to be benefited by the improvement.

Thereafter, by chapter 635 of the Laws of 1923, a further amendment to the act was passed. It contained a technical description by metes and bounds of the area of condemnation, the structures and various classes and species of property therein contained, and which were sought to be condemned, and contained the following provisions: " * * * but nothing in this act contained shall be

deemed to extinguish or impair any existing franchise rights of the Manhattan Railway Company to construct and maintain a circuit breaker and such facilities including stairways in connection with and immediately adjacent to its Third avenue station at Forty-second street as the transit commission may determine to be necessary for the public convenience and necessity * * *. The provisions of this section of this act shall apply to any proceeding to acquire title heretofore authorized pursuant to the provisions of the acts hereby amended and all proceedings heretofore had in relation thereto are hereby ratified and confirmed as legal under and pursuant to this act as hereby amended."

The act also made the usual provision for assessing " all· or any part of the cost, expense, compensation and damages incurred for and the amount thereof, upon real property benefited as a result thereof," and vested the board of estimate and apportionment with power to fix the area of assessment. This area has been fixed and extends from Thirty-fourth street to Fiftieth street and from Second avenue to Fifth avenue.

After amending its resolution of September 30, 1921, above referred to, so as to conform it to the act of the Legislature as finally amended, application for an order to have compensation ascertained and the cost of the improvement assessed in accordance with the provisions of the aforesaid acts and the resolution of the board of estimate and apportionment, was made, and the order of condemnation was granted July 18, 1923. While the application was opposed by the railway company, only one ground of objection urged need be stated here. It was contended that before the order sought could be made, it was necessary for the Transit Commission (successor to the Public Service Commission) to first determine the character of the facilities, including stairways, in connection with its Third avenue station at East Forty-second street, made necessary by the removal of the spur. This objection with all others was overruled at Special Term, and later at the Appellate Division (208 App. Div. 794). The railway company thereafter having applied to the Transit Commission for a determination pursuant to the provisions of chapter 635 of the Laws of 1923, *supra*, as to what facilities at the point in question were required for the public convenience and necessity after the removal of the structure, that body instituted proceedings and conducted hearings for the making of such determination.

The Transit Commission ordered and determined as follows:

(1) That the Commission issue a certificate of convenience and necessity pursuant to chapter 635 of the Laws of 1923; that the petitioner maintain, construct or reconstruct and operate:

Supreme Court, April, 1926.                    [Vol. 126

(a) Two columns supporting the Forty-second street station of the Third avenue elevated line, which columns are now within the roadway of Forty-second street west of Third avenue and a plate girder in place of the present lattice type construction extending from the northerly curb to the southerly curb of Forty-second street.

(b) A stairway at the southwesterly corner of Forty-second street and Third avenue leading from the street to said elevated railroad structure.

(c) A stairway at the northwesterly corner of Forty-second street and Third avenue leading from the street to said elevated railroad structure.

(d) The waiting room, house for trackmen, porter's closet, women's toilet, a circuit breaker house and cable splicing platform now upon the structure of the said elevated railroad.

(e) A duct line under and along Forty-second street from shaft No. 1 of the Queensboro Subway Rapid Transit Railroad to a pipe connection on a column supporting the elevated railroad at Forty-second street and Third avenue sufficient to accommodate all cables now carried on the spur.

After this work was completed and on September 22, 1925, proof of the cost thereof was submitted and the hearings herein finally determined. Before the removal of the elevated structure the property involved had been viewed by the court in the presence of counsel, as required by law.

Three general determinations are now required to be made herein:

*First.* The nature and extent of the property of the railway company in East Forty-second street, within the area of condemnation, and taken in this proceeding.

*Second.* The fair market value of such property on the date that title thereto vested in the city of New York, to wit, December 7, 1923.

*Third.* The cost of the improvements at Forty-second street and Third avenue determined by the Transit Commission to be convenient and necessary after the acquisition and removal of the elevated structure.

The first and second propositions present the most serious problems. Under the first, three elements are involved, namely: (a) the franchise; (b) certain street easements, both private and public, the railway company claims to own; and (c) its structure. There is no dispute as to the existence of (a) and (c). Respecting (b) there is most serious difference as to existence. Respecting the second general proposition involving value, there is as to all three elements of property rights sharp dispute. The third presents less serious difficulty.

These questions will be considered in the order given in so far as practicable, and the contentions of the parties respecting each question briefly stated. In this order the first question to be considered is the franchise, its nature and extent as property, and its value here, if any.

Concededly the franchise both from the State and city had its source in the Rapid Transit Act (Laws of 1875, chap. 606). This authorized the mayors of the cities of the State, upon application of fifty reputable taxpayers, to appoint a commission to determine upon the necessity for the construction of steam railways, and routes and plans therefor. The Transit Commission appointed by the mayor of New York city selected the routes and decided upon the plan for the construction of the railroad. One of the routes selected included this spur as part of the Third avenue route.

The route selected and the plan of construction adopted by the commission thus appointed was finally adopted by the common council and was approved by the mayor September 7, 1875. This final action pursuant to the act of the Legislature constituted the company's franchise. The act itself was held constitutional and the validity of the franchise sustained (*Matter of N. Y. Elevated Railroad Co.*, 70 N. Y. 327), and the grant thereby made was later construed like any other grant as having been " made by the State upon consideration." (*Mayor* v. *Manhattan R. Co.*, 143 N. Y. 1, 31, 32.)

The nature of the right thus acquired by the railway company is to be determined by the power conferred upon the city by the Rapid Transit Act and by subsequent acts of the city taken in pursuance of the power thus conferred. Concededly the franchise thus given by the State and city was to construct and operate an elevated railway in accordance with definite plans adopted by the city, and the rights obtained by the railway company were only such as were authorized by the act of 1875. (*Syracuse Water Co.* v. *City of Syracuse*, 116 N. Y. 167.) The railway thereby became vested " with an interest in the street in perpetuity," for the purposes of an elevated railroad (*People* v. *O'Brien*, 111 N. Y. 1, 38; *White* v. *Manhattan R. Co.*, 139 id. 19; *Milhau* v. *Sharp*, 27 id. 611); and " the abutting rights came within the boundaries of the grant, and if the city had owned the easements they would have passed to the railroad companies by virtue thereof." (*Hindley* v. *Manhattan R. Co.*, 185 N. Y. 335, 355.)

Such an easement was a right in the street with the character of property transferable as such, independent of the life of the corporation. (*People* v. *O'Brien, supra.*) It was " an interest in and to a certain extent a title to the street for the purpose of the

construction and operation of its railroad, which was in the nature of property, and which was sufficient to enable it to treat with abutting property owners in the character of one who had an interest in the servient estate." (*White* v. *Manhattan R. Co., supra*, 26.)

It has been held that such a franchise constitutes a grant of an easement in the street (*People ex rel. Dunkirk & F. R. R. Co.* v. *Cassity*, 46 N. Y. 46, 49; *New York Telephone Co.* v. *State*, 169 App. Div. 310, 316), and in *Consolidated Gas Co.* v. *Baltimore City* (101 Md. 541, 546, 547), where distinction between a franchise and an easement is drawn, it was held that the latter is property to be considered separate and distinct from the former and to be valued as such. In the latter case the easement had been, for the purposes of taxation, separately considered and valued. It was said:

" It will be found upon examining some of the cases that there is occasionally, in the arguments of counsel, a want of exactness in the use of terms, and now and then the *right* to do a particular thing — which *is* the franchise — is confused with the *results* achieved in the exercise of the right, and those *results* are inaccurately spoken of as the franchise. The *right* to occupy the streets with gas mains is a *franchise* — the actual *occupation* of them in that way pursuant to the franchise is the acquisition of an *easement*. You must distinguish between the *right* to do the thing, and the *interest* acquired in the soil by the exercise of that right. The right of a railroad company to be, and to build a road, is a franchise from the State; the roadbed acquired by purchase or condemnation, is an easement altogether distinct therefrom, though obtained as a result of the exercise of that pre-existing franchise.    *    *    *

" The distinction is clear between a franchise, as such, and the property acquired for the use of the franchise. The naked, unused, slumbering franchise is property, but it is property concerning the assessment of which *in that condition* for purposes of taxation, the statutes do not make provision, otherwise than by including it as an element which enhances the value of the shares of the capital stock. But when the franchise is brought into activity and is availed of to accomplish the ends it was designed to effect, the property acquired under it becomes amenable to the tax laws apart from the tax on the stock and its value, as an easement, if an easement it be, may be largely augmented by the use to which the franchise enables that property or easement to be put."

Claimants urge that under these authorities the railway has, in addition to the private easements of light, air and access secured from the abutting owners, a public easement in the street in addition to the mere right of operation given by its franchise; that this additional right is property and consists of the space in the street

occupied by the columns and the structure as a whole, and of the street rights of occupation and control; that this right to occupy and use such space is to be considered in connection with the franchise in determining its value.

The claimants urge further that this space so occupied, the right to which has been granted in perpetuity, is to be measured by its available use, not to the railroad, however, but for any purpose to which it may be applied, and that as the city will adapt it to street uses, thereby relieving the enormously congested traffic conditions in the locality of Forty-second street, it should pay therefor such compensation as the space in question is worth for such purposes; that such space is to be valued upon the basis of charges made by the city to private owners for the occupation of space by overhead structures of any character, such as covered or open platforms connecting buildings, street viaducts and structures of such character. On the basis of such charges claimant's evidence tended to show that this right is worth approximately $300,000.

Assuming the existence of such an easement, I am inclined to the view that for the purposes of valuation herein the franchise and right of occupation of the street are so inseparable in their nature that they must be considered as a single entity. (*People ex rel. Met. St. R. Co.* v. *Tax Comrs.*, 174 N. Y. 417, 440, 441.) The franchise here granted was for one purpose, and one only, namely, for the maintenance and operation of the railroad. The company secured no further rights in the bed of the street. It could erect no other structure therein. It had no right to erect a building in which to store its trains, for example, nor could it use the tracks on its structure for storage purposes alone. Its rights in the street, whatever they are, were strictly limited by its franchise from the State and city, namely, to maintain and operate an elevated railroad. And this it was required to maintain and operate so long as it held its franchise. Otherwise it would be required to forfeit the same.

My conclusion is, therefore, that while this public easement spoken of is to be considered as one of the elements of value of the franchise, it cannot be assigned a value separate and distinct therefrom; and that the value of the franchise must be finally determined upon the basis of the present and prospective earning power of the spur, not, however, considered in isolation, but as a part of the entire Third avenue elevated system.

Before considering the evidence relating to the valuation of the franchise, a brief description of the property within the area of condemnation should be given. The spur in question is approximately 900 feet in length, extending from the Grand Central

Supreme Court, April, 1926. [Vol. 126

Station at Park avenue to the Third avenue station. It was constructed in 1878 as a part of the present Third avenue elevated lines. During that year and prior to the extension of the railroad on Third avenue above Forty-second street, trains ran direct from Chatham Square to the Grand Central Station. For a short time after the extension of the railroad above Forty-second street trains were still operated direct to the Grand Central Station as well as above Forty-second street. Owing, however, to a serious wreck resulting from the collision of two trains at the cross-over at Third avenue, it was decided to discontinue the operation of through trains to the Grand Central, and since early in 1879 a shuttle service has been maintained between the Third avenue station and the spur station at Park avenue.

The service at the time title vested consisted of two trains, having one or two cars, depending upon the character of the traffic. These trains were operated simultaneously, it being necessary for each to leave the station where it had taken on passengers before the other could pull into such station. Both uptown and downtown passengers on the Third avenue trains transferred to the spur without additional charge, and similarly passengers who boarded the shuttle train at Park avenue transferred free at Third avenue to uptown and downtown trains. Downtown passengers were able to transfer to the shuttle train from the same platform upon which they left the Third avenue train, but uptown passengers, and passengers transferring to the shuttle trains going uptown or downtown were required to use the cross-over, by descending stairs to a platform under the tracks, and ascending stairs leading to the uptown platform. In consequence the records show that there were many more west-bound passengers using the shuttle service than east-bound, due no doubt to the more convenient facilities for the use of the platform by the former. In the early history of the spur's operation and before any subways were built it was a far more important and valuable adjunct to the Third avenue system than subsequently. Still the claimants contend that it was, at the date title vested in the city, capable of profitable operation. The city on the other hand contends that its continued operation was a financial detriment to the claimants, rather than a benefit and that the railroad has profited by its removal.

In support of their claim that the spur was operated profitably and not at a loss, the claimants introduced in evidence several charts tending to show the trend of traffic in rapid transit during a period extending back to 1890. These charts were based upon the number of ticket sales or passengers carried. A record of each had been maintained by the railroad and furnished to the Public

Service Commission and its successor, the Transit Commission, since the establishment of that body. They tend to show that between the years of 1890 and 1900, during which period the surface roads were being electrified, there was little or no increase on the elevated lines; that between the latter date and the opening of the West Side subway in 1904, during which time the elevated lines were being electrified, the trend was upward; that following the opening of the West Side subway in 1904, there was a sharp falling off in the traffic on the Manhattan elevated lines; that in 1907 it began to recover and to increase and finally reached its peak in 1917 prior to the opening of the East Side subway, during which time there had been added to the elevated lines the so-called third track; that following the opening of the East Side subway in 1917, there was again a falling off in traffic particularly on the Third avenue elevated line with which the subway was brought into direct competition; that this condition obtained until the twelve months' period ending June 30, 1922, when the upward trend on the elevated lines again set in, due it is claimed to the fact that the East Side subway, particularly at the Grand Central Station, had reached the point of saturation, at which time the elevated line began to benefit by the overflow traffic.

With respect to the traffic at the spur station at Park avenue during this period from 1890, it appears that there was an increase from 1,413,000 in 1900 to 2,273,000 in 1904; from then until 1906 there was a drop to 996,300; from 1907 to 1913 there was little change; from 1913 to 1918 there was an increase to 1,862,464, and from that year to 1922 a decrease to 1,390,000. For the same period of years at the Third avenue station at Forty-second street, there was an increase between 1900 and 1904 from 1,244,000 to 2,225,000; a drop in 1905 to 2,086,000; but slight variation from then to 1916, when it began to increase and so continued with few exceptions until 1921 when it reached 3,612,000. After a decrease in 1922 it rose to 3,683,000 in 1923.

The evidence further tends to show that the combined traffic at the spur and Third avenue stations increased from 2,657,000 in 1900 to a peak in 1904 of 4,499,000. This was followed by an abrupt drop to approximately 3,000,000 in 1907, and was due generally, if not almost entirely, to a loss on the spur; thereafter and with some fluctuations, there was an increase to 4,634,000 in 1907 and a final increase to 5,082,000 in 1921. There was a decrease in 1922 to 4,732,000, but in 1923 an increase to approximately 5,000,000.

This evidence further tends to show that the upward trend had begun to manifest itself at the two stations in question in 1921;

that at the spur station the sales increased from 1,290,100 for the twelve months ending June 30, 1922, to 1,358,383 for the twelve months ending June 30, 1923, and to 1,439,524 for the twelve months ending November 30, 1923, as compared with 1,293,880 for the twelve months ending November 30, 1922; that at the Third avenue station the sales increased from 3,441,700 for the twelve months ending June 30, 1922, to 3,683,883 for the twelve months ending June 30, 1923, and to 3,928,690 for the twelve months ending November 30, 1923, as compared with 3,483,600 for the twelve months ending November 30, 1922.

Following the discontinuance of the spur on December 7, 1923, there were of course no further ticket sales at the spur station at Park avenue. Concededly, the sales at the Third avenue station immediately increased and the sales there slightly exceeded the prior combined sales of the two stations. But it is contended by the claimants that based on the normal upward trend as disclosed in the sales of tickets at each of the two stations for the eighteen months immediately preceding the cessation of the spur, considered in connection with a corresponding upward trend of sales at the Second, Sixth and Ninth avenue stations at Forty-second street and at the Second, Sixth and Ninth avenue stations at Thirty-fourth street during the same period, the combined sales of the two stations, if the spur had continued in operation, would have been far in excess of the sales at Third avenue after December 7, 1923. Thus it is claimed that for the year ending June 30, 1924, there was a reasonably estimated loss of 778,400 ticket sales resulting from the abolition of the spur.

Based upon a five-cent fare the estimated loss for the five years in question would exceed $100,000 the first year and a proportionate increase upon the figures given for the subsequent years. After deducting the annual cost of operation, which was conceded to be the sum of $41,230, these figures would tend to show a substantial loss to the railroad.

The evidence also tended to show that the subway stations at the Grand Central and at Times Square on December 7, 1923, had practically reached the point of saturation, and that while the traffic at each of these points tended to show some increase, such increase was relatively less during the two years preceding December, 1923, than the increase on the elevated lines along Forty-second street and other points in the immediate vicinity.

The petitioner relied chiefly upon the testimony of Dr. John Bauer to support its contention that the spur not only was not a source of revenue and benefit to the claimants, but an unprofitable part of the elevated system and a burden. He had been instructor

and assistant professor of economics and finance in Cornell University from 1908 to 1914. He had given particular attention to public utility regulation and finance, including railroad transportation, finance and organization. From 1914 to 1916 he was statistician to the Public Service Commission of this State in the First District, during which time he made an extensive survey of street railways respecting their franchises, financial history and operating conditions. From October, 1916, to June, 1917, he was at Princeton University in charge of the courses of accounting, corporation finance and public utility regulation and finance. During this time he also reported to the Public Service Commission with respect to operations under certain contracts with the city of New York of both the Brooklyn Rapid Transit system and the Interborough Rapid Transit Company. Between June, 1917, and November, 1919, he was chief of the accounting division of the Public Service Commission in the First District. In connection with his work with the Public Service Commission he had become acquainted with and had covered most of the phases of the existence and operation of the Manhattan Railway Company and had made a special study of the spur in connection with the Commission's hearing as to its being necessary and convenient to the public service and whether or not the physical property was an impediment or obstruction to the public use of Forty-second street.

His analyses and conclusions were based upon this experience, the statistics and evidence of claimants, and further statistics furnished him. Broadly taken, his line of reasoning was in the following manner, taking into consideration the years of 1919-1923 inclusive.

By test it had been found that the normal number of east-bound passengers using the spur exceeded the ticket sales at the spur station by six and five-tenths per cent. The ticket sales, exclusive of turnstile readings, were increased by that proportion, thus arriving at the number of east-bound passengers. By actual count on two days in November, 1923, it was found that west-bound passengers exceeded the number of east-bound passengers by about fifty-eight per cent. The witness adopted, to the benefit of the spur, this percentage as sixty per cent and so reached figures for west-bound traffic during the period in question. Multiplying the combined totals by five cents he obtained a result representing the gross revenue from traffic. By a card inquiry on a single day in November, 1923, in which 4,828 cards were returned out of 7,700 distributed, it was computed that out of the total distance traveled three and one-tenth per cent was on the spur. Dr. Bauer, for the purposes of his computation, took it as five per cent and allocated

that portion of the gross revenue from the traffic to the spur. To obtain the total revenue to be allocated to the spur he added to the last figure an average of eleven one-hundredths per cent of the miscellaneous revenue, apart from traffic revenue, of the entire system. This last percentage was obtained by determining the percentage of car miles on the spur as compared with the car miles on the entire system.

To compute for the respective years the operating cost of the spur, he made what he considered a reasonable allocation to the spur of the operating expenses and taxes of the entire system and added thereto his estimate of the cost of operation of the cars on the spur and of the platforms with respect to labor. Operating expenses were allocated as follows: The witness took the total cost per car mile on the entire system for maintenance of way and structure, maintenance of equipment, miscellaneous and taxes and multiplied the result by the number of car miles on the spur, assuming that the cost on the spur would equal, if it did not exceed, that on the rest of the system. The cost of operation of cars, including platform expenses, on the spur was specifically presented for the computation in detailed form for 1923 only, but the witness was of the opinion. that they were as large at least for the preceding years in question and for those years he attributed the same total.

From the foregoing it was apparent that on the city's theory the spur was, during the period in question, operated at a distinct loss. A recapitulation of his figures follows. The first column shows gross revenue, the second expense, and the third excess of expense over revenue for the spur during the respective fiscal years.

| | | | |
|---|---|---|---|
| 1923 | $11,042 48 | $35,860 40 | $23,017 92 |
| 1922 | 10,408 21 | 35,280 39 | 24,872 18 |
| 1921 | 11,553 63 | 35,813 99 | 24,260 36 |
| 1920 | 11,990 87 | 36,122 66 | 24,131 79 |
| 1919 | 12,908 70 | 36,459 05 | 23,550 35 |

This witness stated that economists would compute the value of the properties of a railroad and of most industrial properties on the basis of its earning power. They would estimate or determine the annual future net earnings and capitalize these amounts or discount them at the market rate of interest or discount. Under this method thus applied the spur franchise of course had no value whatever.

The witness also considered the possible future or potential value of the spur. He made his deductions from the so-called

trend of traffic, the theory adopted by claimants, as indicated by ticket sales at subway and elevated stations in the immediate neighborhood. His chart, based upon fiscal years, showed for the period they were in existence the ticket sales between 1900 and 1923 of the following stations: The spur, the Third and Sixth avenue elevated lines, the Times Square subway stations of the Interborough Rapid Transit and Brooklyn Manhattan Transit, and the Grand Central subway station, all on Forty-second street. Summarized, it showed the following indicated gains and losses, the first figures from left to right being those of the spur and the second of all stations:

| | | |
|---|---|---|
| 1900–1923 | 04.3 per cent | 1594.6 per cent |
| 1900–1905 | 11.2 " | 175.6 " |
| 1905–1910 | 30.2 " | 103.6 " |
| 1910–1915 | 11.3 " | 29.2 " |
| 1915–1920 | 12.2 " | 86.1 " |
| 1918–1923 | 37.1 " | 74.1 " |

There is further evidence in the record which tends to show the ticket sales for the fiscal and calendar years, for monthly, yearly and longer periods, of other stations such as Thirty-fourth and Forty-seventh streets on Third avenue and Thirty-fourth, Forty-second and Fiftieth streets on Second avenue, from which various deductions are attempted to be drawn by both sides, but which are too voluminous and of too complex a nature to justify a full recital here.

Suffice it to say that after a full consideration of the evidence thus referred to, and of all of the evidence in the case, and after viewing the structure in the course of its operation, I am of the opinion that the claimants have failed to sustain the burden of establishing that the spur, at the time title vested, when considered by itself, was profitably operated. The upward trend of traffic which is claimed to have set in about 1922, assuming its existence to have been established, covers so comparatively short a period that it affords an unsatisfactory basis for the conclusion that it was at all permanent in character, or of such a nature as to show that the spur, considered by itself, would ultimately be operated upon a paying basis. Concededly the upward trend was due in part at least to the installation of the turnstiles in April, 1923. Moreover, it is to be borne in mind that the former traffic of the spur has not all been lost to the Third avenue system. On the contrary the evidence tends to establish that a great part thereof still reaches the Third avenue line by means of the station at

Third avenue and Forty-second street. In fact, since the removal of the spur the ticket sales at this station considerably exceed the combined sales at this station and the spur station at Forty-second street. While this increase is in part due no doubt to the increased station facilities at the former, concededly a large number of passengers who formerly boarded the spur at the Park avenue end still continue to take the Third avenue system at the Third avenue station. But assuming that the combined traffic of the spur, if still operated, and the Third avenue station would exceed that at the latter station at the present time, such loss, when the cost of the continued operation of the spur is taken into account, seems to me to be of slight consequence.

But the fact that the spur probably was operated without profit is not conclusive on value. It was an integral part of an elevated railroad system which is shown upon the evidence to be operated on a paying basis. This system is composed of various parts, many of which, if considered separately, might show unprofitable operation. Upon the basis of earning power adopted by the city no doubt it would be possible to show that various portions of the claimants' system, such as specified stations or particular portions of trackage between stations, are operated at a loss. Clearly this should not be adopted as an absolute or final test. Steam railroads, no doubt, have many spurs and switches which may be maintained and operated at a loss to the companies, yet their maintenance and operation may promote the maintenance and operation of the complete railroad system and thus lend some value to their franchises. If the spur has any value as a feeder to the main system, either present or potential, the defendant is entitled to compensation therefor. Not only its present earning power but its prospective values must be considered. (*State of Missouri ex rel. S. W. Bell Tel. Co.* v. *Pub. Serv. Comm.,* 262 U. S. 276, 288.)

As already appears, it is contended by claimants that the Forty-second street subway station at the Grand Central has reached, or soon will reach, the point of saturation, and that by reason thereof the spur, if it had continued in existence, would have derived the benefit of this overflow. The extent of this overflow, or what part thereof the Third avenue elevated would lose by the elimination of its Park avenue station, especially in view of the fact that the public still has an available station at Forty-second street and Third avenue with its improved facilities, may be difficult of ascertainment. However, it is a fact which should and must be considered.

Much is made by the city and the attorney for the property

owners of the fact that the Manhattan Elevated Railway Company's lines are being operated under a long term lease by the Interborough Rapid Transit Company and of the practical result of the joint ownership and control of the two systems by the claimants. It is urged, therefore, that in reality the Manhattan Elevated Railway Company will sustain no loss because traffic diverted from its lines is now using the subway. On the other hand, it is urged on behalf of the Manhattan Company that there is always a possibility that the Interborough may forfeit its lease with the result that the Third avenue elevated system and all other elevated lines will be thrown back upon its hands for future operation. In such event it is urged that the two systems would again be thrown into competition and, therefore, the spur in such a contingency would be of great value to the Manhattan Company. Certainly, it is not beyond the range of possibility that such a result may obtain and it is a consideration the court must take cognizance of in determining the question of value. Moreover, it is to be borne in mind that the income of the spur at and prior to the time title vested, was based upon a five-cent fare. The claimant, unlike the Interborough, is not limited to this minimum charge and in the event of a reverter to the Manhattan Company a higher fare might be charged. This might well result in a profitable operation even upon the city's theory of value. While these considerations just adverted to may be somewhat speculative in character, they may be generally considered. (*Brooks-Scanlon Corp.* v. *U. S.,* 265 U. S. 106, 125, 126.) In the case cited the possibility that through governmental action a contract might be rendered impossible of performance was held to be a proper element of damage at the date of taking.

All things considered, I am of the opinion that the franchise has some value. The amount, of course, is difficult of ascertainment, but this fact in itself should not prevent an award if it may fairly be said that the evidence establishes a value therein. I am of opinion that it has some value, the reasons for which and the amount thereof will be hereinafter stated.

The next question to consider is the so-called private easements of light, air and access. Their consideration presents the most serious problem involved. In so far as their existence in the railway company is concerned, they must be considered separate and distinct from the franchise owned by the railway company. As already appears, it was generally assumed when the franchise was granted that such grant was sufficiently broad to give to the railway company all street rights essential to the erection and

operation of its railroad. It was generally believed that all necessary easements belonged to the city and that they passed under the franchise granted, and if these easements of light, air and access, so called, were vested in the city instead of the abutting owners, as subsequently held, they would have been included in such grant (*Hindley* v. *Manhattan R. Co., supra*); and where the city itself owned the abutting property, title to these private easements appurtenant thereto passed under the grant. (*Herzog* v. *N. Y. Elevated R. R. Co.*, 76 Hun, 486; affd., on opinion below, 151 N. Y. 665; *Hindley* v. *Manhattan R. Co., supra.*)

But long after the railway company secured its franchise these easements were held to be the property, not of the city, but of the abutting owners (*Story* v. *New York Elevated R. R. Co.*, 90 N. Y. 122); and the burden of acquiring them was thereupon thrust upon the railway. That this burden was onerous has been recognized by the Court of Appeals. In *Mayor* v. *Manhattan R. Co.* (*supra*, 30), where the question under consideration was whether or not a new line by way of extension to an existing system was burdened with the restrictions and obligations of the latter, the court took occasion to say:

" When the Rapid Transit Act of 1875 was passed the answer to the question whether the plan therein provided for would prove a success was in great doubt. Certain privileges and franchises were provided to be given companies organized or operating a road under the act, and in return certain conditions and burdens were exacted from and imposed upon such companies. The persons who might be found willing to invest capital in the project might, in one sense, be termed ' adventurers,' because they would be investing their money in a scheme the result of which was then most doubtful, and which might leave them with their capital wasted, and with a costly and at the same time worthless structure on their hands. It is safe to say if at that time the interest of abutting owners had been understood to be as it has been since decided, not a railway would have been built under the provisions of this act of 1875. It is a matter of public history that at this time capitalists were timid as to venturing their money in what seemed to be a somewhat visionary scheme. Some reasonable prospect of possible future profits to arise from the experiment would necessarily have to be presented before the risk would be taken. The above act was the means of testing by practical experiment the question of the feasibility of elevated railways, and the possibility of their becoming a paying investment while at the same time furnishing a satisfactory solution of the problem of rapid transit through the city.

" The roads have been built under the provisions of the act, and subsequent to their building (many think in consequence thereof) the upper part of the city has grown enormously, and has in truth, become transformed from vacant swamps to streets bounded by rows of costly buildings.  The roads have certainly shared in this prosperity, but the burden and effect of payment for the interests of abutting owners have been, still are and always must be felt most powerfully.  The large amounts of these payments make a very strong drain upon the financial ability of the companies.  That they are able to go on under the obligation and yet earn enough to make the property a valuable one is surely not a cause of regret, nor should it furnish a reason for treating the companies other than in a fair spirit."

It is the contention of the claimants that these easements thus acquired at great expense by the railway company constitute property, absolute title to which is vested in it; that it is real estate and exists separate and distinct from the railroad; that it is entitled to compensation therefor at the market value thereof; that the measure of this value and the subsequent damage to the railroad is the rule adopted against it when it was compelled to purchase the easements, namely, the difference in value of the abutting property before the removal of the spur and without the easements, and its value with the structure removed and the easements restored. It is urged that its property has been condemned against its will; that the removal of the structure has had the effect of at once restoring to the abutters these easements now greatly enhanced in value; that the value of the abutting property as a whole is thereby greatly increased; that the city is to be benefited by the enormous increase in the taxable value of the abutting and neighborhood property, and that legally and equitably the railway is entitled to the present value of these easements included within the condemnation area for which, it appears from the evidence, it was required to pay approximately the sum of $200,000 as future damages alone.  In addition a substantial amount was paid as past damages and a considerable portion of the easements were acquired by prescription without the payment of money damages.

The city on the other hand contends that these easements are not owned by the railroad company; that they are incapable of ownership separate and apart from the abutting property; that while the railway company took the easements, in one sense, it did not secure title thereto in a strict legal sense, but acquired the right merely to destroy them and to keep them destroyed in perpetuity for railroad purposes only; that when the railroad is destroyed the company's rights in the easements disappear and

revert to the abutting owners and that they are without value to claimants unless the railroad itself has value. The city's contention in respect to this phase of the case is thus stated in its brief: " The Railway Company owned at the time title vested in the city in this proceeding (a) a franchise, (b) an elevated railroad structure, (c) *and the right to maintain the structure for railroad purposes without liability to the abutting owners,* the three constituting one entire property, a railroad in a public street."

It is to be observed that the city recognizes in thought at least a right in the claimant separate from its franchise to maintain its structure as against abutting owners.

It becomes necessary at the outset to consider the nature of this right or interest of the railway company, whether as easements, or whatever interest or right it may be called. That the easements were property in the hands of the abutting owners; that they were " taken " and appropriated by the railway company within the meaning of the constitutional provision requiring compensation, cannot well be disputed. This clearly appears from the first decision of the Court of Appeals in *Story* v. *New York Elevated R. R. Co.* (90 N. Y. 122) and its later decisions (*Lahr* v. *Metropolitan Elevated R. Co.,* 104 id. 268; *Kane* v. *N. Y. Elevated R. R. Co.,* 125 id. 164). In fact mere damage or injury without such " taking " would not have entitled the abutters to compensation. (*Story* v. *New York Elevated R. R. Co., supra,* dissenting opinion, 184.) It was held that the erection of the structures constituted a " taking " of the easements and their appropriation by the railroad company. (*Lahr* v. *Metropolitan Elevated R. Co., supra.*) In later decisions the easements are spoken of as having become appurtenant to the railway property (*People ex rel. Manhattan R. Co.* v. *Woodbury,* 203 N. Y. 231), and such easements have been recognized not only by the courts of this State but by the United States Supreme Court. (*Muhlker* v. *N. Y. & Harlem R. R. Co.,* 197 U. S. 544; *Birrell* v. *N. Y. & Harlem R. R. Co.,* 198 id. 390; *Sander* v. *State,* 182 N. Y. 400.) It is upon these expressions of our highest court that claimants rely and base their claim that the railway company is vested with title.

At times the courts apparently have attempted to distinguish between these rights of abutting owners in the street and true easements. In *Stevens* v. *N. Y. Elevated R. R. Co.* (130 N. Y. 95, 101) it was said: " The characterization of these street rights as easements and implying that they are governed by the rules, and are subject to the limitations of common-law easements, tends to obscure the rights of abutting owners on the one hand and of the corporations on the other. They may be easements in the sense

that the owner of land is sometimes said to have an easement for lateral support in adjacent land, or that the owner of land bordering on navigable waters having certain private rights to the shore is sometimes said to have an easement, but in neither case are the rights common-law easements." They have been classed as " quasi easements " (*American Bank Note Co.* v. *N. Y. Elevated R. R. Co.*, 129 N. Y. 252, 272); and " to a certain extent they were regarded as *sui generis*, owing to the peculiar situation, and authorities apparently applicable were held not to apply " (*Hindley* v. *Manhattan R. Co., supra,* 347); and " it is said of them that it is easier to realize their existence than to trace their origin; that they arise from the situation, the course of legislation, the trust created by statute, the acting upon the faith of public pledges and upon a contract between the public and the property owner, implied from all the circumstances, that the street shall be kept open as a public street, and shall not be devoted to other and inconsistent uses." (*White* v. *Manhattan R. Co.,* 139 N. Y. 19, 25.)

Nevertheless, they have been held to be easements to the extent at least that they cannot be owned separate and distinct from the ownership of the land to which they are appurtenant. In *Kernochan* v. *N. Y. E. R. R. Co.* (128 N. Y. 559) it was held that where premises were leased for a term of years *after* the construction of the elevated railroad, the lessee was not the proper party to recover damages for the interference with the easements, but that such right belonged to the owner (reversioner) as it was an injury to the inheritance.

*Pegram* v. *N. Y. Elevated R. R. Co.* (147 N. Y. 135) was an equitable action brought against the railway company for an injunction restraining it from maintaining the structure and for past damages. Upon the trial it developed that the plaintiffs had conveyed, *pendente lite,* the premises to a third party. In the conveyance to such third party the plaintiffs had reserved to themselves " all damages and claims for damages now or hereafter caused said party   *   *   * and the right to convey or release " in the name of the grantee of said easements. The court cited the *Kernochan* case, and held that these easements were appurtenant to the premises themselves and that " in the nature of things they are indissolubly annexed thereto until extinguished by release or otherwise. They are incapable of a distinct and separate ownership." It was held that the reservation in question could not be considered as an assignment of the easements because these, as already stated, were appurtenant to the premises and bound to them, and as the premises had been conveyed to a third party, the latter owned them and alone could release them.

Conversely, in *Shepard* v. *Manhattan Railway Co.* (169 N. Y. 160) it was held that the present owner of the abutting property was the sole party who could bring an action for further damage, and this in spite of the fact that mesne conveyances through which he claimed title had all reserved the right to such.

In *McKenna* v. *Brooklyn Union El. R. R. Co.* (184 N. Y. 391) the plaintiff brought suit against the defendant railway companies for damages and injunctive relief by reason of the impairment of the easements. While the action was pending she conveyed the property but reserved the easements and all the right, title and interest thereto, including the suit in question. This deed was duly recorded and the defendant railway companies had knowledge of it. They obtained a general release of the easements upon the payment of a certain sum to the grantee. The plaintiff then brought the action in question for the purpose of having the grantee declared a trustee for her benefit, and sought to have the release given by the grantee set aside and canceled, and to have the grantee made a party.

WERNER, J., after reciting the law of the preceding cases and holding that such reservation had not created a trust in the easements themselves, held that the reservation had created a trust in the proceeds thereof; that under the facts disclosed the railway companies were justified in obtaining a release from the grantee, and that the sum reserved by the latter in the absence of allegation and proof of fraud or obvious insufficiency, was conclusive as between the grantor and the grantee. All that the grantor obtained was an equitable lien upon the proceeds in the hands of the grantee.

*Drucker* v. *Manhattan R. Co.* (213 N. Y. 543) reaffirmed the doctrine of the last case and further held that a subsequent grantee was held to notice of such reservation if recorded and was bound thereby; that such grantee held the bare, naked legal title to the easements, the beneficial title thereto remaining in the grantor who had reserved the easements to himself.

The seeming contradiction in these two lines of cases — those in which the railroad is said to have " taken " the easements, and those in which the easements are said to have been destroyed or " extinguished "— is more apparent than real. It is clear that the courts, in each class of cases, were considering these easements from a different viewpoint. In the " taking " cases they were viewing them as between condemnor and condemnee and employed the word " taking " not so much to hold that the railroad had *possessed* itself of the easements, as to indicate that by its act it had deprived the owner of them. It is well settled that a right for public use may be taken by simple destruction. (*Duckett*

*& Co., Inc.,* v. *U. S.,* 266 U. S. 149; *Peabody* v. *U. S.,* 231 id. 530, 538.) It was a " taking " within the meaning of the Constitution, which does not provide that one cannot gain property without paying therefor, but that one cannot be *deprived* of property without compensation given. In the other class of cases the court was considering the question from the viewpoint of the abutting owner or successive owners. They were then considering the easements strictly as such. They used the term " extinguish " to apply to enjoyment rather than to ownership. It seems clear that in each instance the courts have used loosely words of technical precision to express by way of analogy an idea which because of its novelty and unusualness had no strict terminology of its own. Like all new developments in the law the subject in its inception was viewed largely in the aspect in which the particular situation presented itself, and when a further but different aspect was presented, the court again employed the most available language without a consideration of all the " future possibles." And now that the question of these easements must once more be viewed from a different viewpoint, namely, that of the railroad company, it would seem that legal terminology of a more precise meaning and character must be found in order to convey by way of analogy a novel idea.

Considering the question in the light of the so-called " reservation " cases, and the easements from a common-law viewpoint, it is clear that the railroad company did not take or gain possession of the easements formerly held and possessed by the abutting property owners. The easements consisted in the right of the abutting property owner to have the public highway remain free and unobstructed so that the light, air and access normally appurtenant to his property should in no way be diminished. But as the railroad has no abutting property, and possesses only such property as it has in the street, it cannot be said to own any such easements. On the other hand, however, the parties are all in accord that it possesses at least " a right " to impair the easements and keep them impaired in perpetuity. And just as these easements are said to be only *quasi* easements and not true easements, and their invasion a *quasi* trespass, but not a true one (*Bly* v. *Edison Electric Illuminating Co.,* 172 N. Y. 1, 7), so, too, this right to impair, though not strictly such, may come to be regarded as an easement in gross.

Some consideration of the effect of this proceeding in respect to this right may not be out of place. Does this right by virtue of condemnation and demolition of the structure revert *ipso facto* to the abutting owners, as contended by the city, or does it vest

in the city? By virtue of physical laws of course the abutting owners again enjoy these easements the moment the structure is removed. But the ownership of the right to their destruction and the enjoyment thereof owned by the railroad might be said to vest in the city. If this is not so, then the city, if it hereafter determined to restore the elevated structure or act in some other manner so as to interfere with the light, air and access of the abutters within the area of condemnation, would be required again to pay for the destruction and enjoyment of the same easements for which full consideration has already been paid to them and for which the city, by virtue of the statute under which this proceeding is conducted, is required to pay herein. The same would be true of the railroad if its franchise was again restored to it and the structure rebuilt.

Let us assume that prior to the condemnation the railroad's structure had so deteriorated that it became a public nuisance by virtue of danger to the general public from its use as a railroad and the company was required to tear it down and rebuild. Could it reasonably be contended that before rebuilding, these easements would have to be repurchased because in the meantime enjoyment of them reverted to their original owners? Or suppose that under permissive legislation the railroad had suspended operation of the spur and torn down the structure, and that under the same legislation it had rebuilt. Would it again have to purchase the right to impair these easements?

It is to be borne in mind that these private easements are unlike the so-called public easements in that they did not spring into existence *ex necessitate* by the granting of the franchise. They seem analogous to a situation where a railroad, having been granted a franchise to operate over a certain route, is required in order to enjoy its use, to purchase the land for its roadbed. In such case the railroad would own the land even after the railroad had been abandoned.

However, with the question of where title to this right vests we are not much concerned in this inquiry. The question here is: Of what has the condemnee been deprived? It is immaterial whether or not this deprivation or taking has resulted from an appropriation of the property by the condemnor, or by the latter having destroyed the property. As already appears, property may be taken in condemnation by a mere destruction. (*Duckett & Co., Inc., v. U. S., supra; Peabody v. U. S., supra.*)

That such right is a species of property owned by the railroad and capable of separate appraisement has been established successfully by the city itself in other proceedings. As already appears

the city's right to treat it as property for the purposes of taxation has been recognized and sustained by the Court of Appeals. (*People ex rel. Manhattan R. Co.* v. *Barker*, 165 N. Y. 305, 316; *People ex rel. Manhattan R. Co.* v. *Woodbury*, 203 id. 231, 235.)

My conclusion is, therefore, that however this right be regarded, whether an easement appurtenant or in gross, or a right to possession for the purpose of extinguishment and enjoyment, it is a property right which has become vested in the railroad and which it is entitled to enjoy in perpetuity; a right for which it has been taxed as property and for which it is entitled to be compensated.

It is argued that the railroad in the first instance was an invader, trespasser and wrongdoer with respect to these easements. Such argument, however, comes with poor grace from the city, for it authorized the unlawful acts. Moreover, the railroad company admittedly acted in good faith in the belief that its structure, as originally erected, was lawful and it has paid large sums to the abutting owners.

In determining its value an important question to consider is whether it is owned solely for railroad purposes or whether it is available for any other purpose in the hands of the railroad or its grantee. Claimants assert an ownership separate and distinct from the franchise and the right to maintain and operate the railroad and claim to be entitled to its value measured by any purpose to which it is adapted. As already appears, the city contends that it is owned for railroad purposes only, and that it has a value measured by such limited use.

In this connection a consideration of the manner in which the right to continue the impairment of the easement was acquired by the railroad is necessary. This acquisition was had in one of four ways: By conveyance, (1) voluntary through direct negotiations; and (2) pursuant to court judgments for money damages in lieu of injunction; (3) by condemnation; and (4) by prescription.

Where written instruments were exchanged they seem to have partaken of a double nature. In so far as past damages were concerned they were in the form of releases. With respect to continuing trespass and future damages they were in the form of deeds. There seems to be no question that the conveyances made as a result of direct negotiations between the railroad company and the abutting owners were usually in the form of full covenant warranty deeds. Of a total frontage of approximately 1,600 feet of abutting property, these voluntary conveyances covered an approximate frontage of 483 feet.

Conveyances pursuant to judgments covered an approximate

frontage of 700 feet. The judgments contained an alternative provision for payment by the railroad company to the abutting owners of certain damages " upon the latter's tender of a duly executed conveyance or grant of so much of the property * * * and of the easements appurtenant thereto, as has been taken and appropriated by the defendant for the purpose of their structure or railroad * * *."

These conveyances pursuant to judgments contain recitals that there are claimed to be appurtenant to the abutting property certain rights or easements to the enjoyment of the street and an interest or estate in the land forming the bed thereof, and a statement by the owner to the effect that by said deed he had hereby granted and conveyed " all right, title and interest * * * in said East 42nd Street and the land forming the bed thereof, and the easements therein appurtenant to said premises which are or may be necessary for the construction, maintenance and operation of an elevated railroad in said street * * *." These conveyances likewise were in the form of warranty deeds.

It is argued not without reason that under the voluntary conveyances the railroad company obtained a title not restricted to railroad purposes merely, but an unqualified right coextensive with the fee such as would be taken by a steam railroad company which purchases through similar conveyances property in the open country for the construction of its roadbed. It is argued that the conveyance of so much of the property as was necessary for the construction and maintenance of the railroad constituted a limitation of the quantity of the grant rather than a limitation of its quality. It is urged that because the property conveyed was of so unusual a character it admitted of no accurate description by metes and bounds, and the language employed, therefore, was the only available language for describing the property conveyed.

With respect to conveyances pursuant to judgment as a result of injunction proceedings, a different situation is presented. The nature of the estate by these conveyed might be regarded as of the same character as in those by voluntary conveyance were it not for the fact that the courts have held that these injunction proceedings are but substitutes for condemnation, and that the railroad gained thereby the same title as it would acquire in condemnation. (*American Bank Note Co. v. N. Y. Elevated R. R. Co.*, 129 N. Y. 252, 270.) This decision considered in connection with the rule that unless expressly authorized the railroad company by virtue of condemnation may take property only for its particular use, leads to the conclusion that the railroad obtained only a qualified fee as a result of the injunction proceedings. While this

distinction is one to be noted, I am of opinion, as will hereafter appear, that so far as value is concerned it is a distinction without a material difference.

There apparently was but one condemnation proceeding. From the petition and report of the commissioners and the order of comfirmation, the railroad company appears to have secured " so much of the privileges and easements or other interests in said East 42nd Street as are taken, appropriated or interfered with by the construction, maintenance and operation of the elevated railroad * * *," and that the railroad was authorized " to have and to hold the same * * * for the purpose of maintaining and operating an elevated railroad * * * the estate thereby taken in such land being limited to the right to use the same to maintain * * * and operate a railroad thereon * * * so long as the aforesaid street is used and maintained as a public street * * *." Because of the limitation of the exercise of eminent domain heretofore noted, and the language of the recitals, it would seem that here the railroad obtained the right to destroy the easements for railroad purposes only, and thus acquired a qualified title.

By prescription the railroad acquired title to a frontage of approximately 400 feet. Prescription rests upon the fiction of a lost deed. However, as the grant presumed is no broader than the extent of the adverse use, and since the railroad used this right only for railroad purposes, the right acquired thereby was limited to such purposes. (*Lewis* v. *New York & Harlem R. R. Co.*, 162 N. Y. 202; *Bremer* v. *Manhattan R. Co.*, 191 id. 333.)

But on the question of valuation, the holding of an unqualified or a qualified fee does not seem to be material, for as was held in *Hudson & Manhattan R. R. Co.* v. *Wendel* (193 N. Y. 166) the interest was a permanent one, and while it existed the railroad was entitled to the exclusive use, possession and control, the owner having no right to use, occupy or interfere therewith in any manner whatsoever, the use of the railroad being exclusive of the owner. In assessing the damages in such cases a possible reverter is never contemplated and the operation is regarded as permanent and damages awarded on that basis. (*Hudson & Manhattan R. R. Co* v. *Wendel, supra; Miner* v. *N. Y. C. & H. R. R. R. Co.*, 123 N. Y. 242.)

With respect to the valuation of the various species of property involved herein the general principles of law applicable are well settled. The owner is entitled to " just compensation," and to have considered every element that can fairly enter into the question of valuation. (*Matter of City of New York*, 198 N. Y. 84.)

It is, moreover, entitled to the fair market value for any available purpose and not merely for the purpose to which it has been devoted by the owner. ( *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53; *Boom Co.* v. *Patterson*, 98 id. 403.) Such value is dependent on and to be determined by the specific facts and circumstances of each case. (*Boom Co.* v. *Patterson, supra*.) But whatever such value, it is the value to the owner or condemnee and not to the condemnor (*Boston Chamber of Commerce* v. *City of Boston*, 217 U. S. 189), and it is the value thereof at the time of the taking. (*Brooks-Scanlon Corp.* v. *U. S.*, 265 U. S. 106, 123.)

The rule that value for all available purposes must be considered has frequently been expressed and applied. In *Boom Co.* v. *Patterson* (*supra*) the defendant in error was the owner of one island and parts of others in the Mississippi. Their position in the river specially fitted them for a log boom, for which purposes the plaintiff in error acquired them by condemnation. The jury awarded the defendant in error $9,358.33 and in a special verdict had stated that all of said value above $300 had been assessed because of the adaptability for this special purpose. In discussing the principle upon which compensation should be estimated the court, *inter alia*, said (p. 407):

" In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what it is worth from its availability for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated.

" So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future. * * *

" Their adaptability for boom purposes was a circumstance, therefore, which the owner had a right to insist upon as an element in estimating the value of his lands.    *    *    *

" The views we have expressed as to the justness of considering the peculiar fitness of the lands for particular purposes as an element in estimating their value find support in the several cases cited by counsel.   Thus, in the *Matter of Furman Street* (17 Wend. 669), where a lot upon which the owner had his residence was injured by cutting down an embankment in opening a street in the city of Brooklyn, the Supreme Court of New York said that neither the purpose to which the property was applied, nor the intention of the owner in relation to its future enjoyment, was a matter of much importance in determining the compensation to be made to him; but that the proper inquiry was, ' What is the value of the property for the most advantageous uses to which it may be applied? '   In *Goodin* v. *Cincinnati & Whitewater Canal Co.* (18 Ohio St. 169), where a railroad company sought to appropriate the bed of a canal for its track, the Supreme Court of Ohio held that the rule of valuation was what the interest of the canal company was worth, not for canal purposes or for any other particular use, but generally for any and all uses for which it might be suitable. And in *Young* v. *Harrison* (17 Ga. 30), where land necessary for an abutment of a bridge was appropriated, the Supreme Court of Georgia held that its value was not to be restricted to its agricultural or productive capacities, but that inquiry might be made as to all purposes to which it could be applied, having reference to existing and prospective wants of the community.   Its value as a bridge site was, therefore, allowed in the estimate of compensation to be awarded to the owner."

The *Boom* and the *Furman Street* cases are leading authorities, always cited and as often approved and followed.   The *Goodin* [*Ohio Canal*] case, approved in the *Boom* decision, is interesting because the easements there condemned had become worthless for canal purposes, and the company itself was insolvent.

In   *United States* v. *Chandler-Dunbar Co.* (*supra*) the court, quoting with approval from *Boom Co.* v. *Patterson* (*supra*), said: " Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose."   And it was further said (at p. 81): " The owner must be compensated for what is taken from him, but that is done when he is paid its fair market value for all available uses and purposes."

It is to be noted that a distinction is to be drawn between the measure of the damages and the evidentiary facts relevant thereto and to be considered therewith. While adhering to the general rule fixing the measure of damage, it would seem that because of the exceptional circumstances here present, great latitude in the reception and consideration of evidence should prevail. This is especially so in view of the work of public benefit done by the railroad and its having unknowingly assumed, in the first instance, the hardships referred to in *Mayor* v. *Manhattan R. Co.* (*supra*).

If there were a market price for the property taken that would be controlling. (*United States* v. *New River Collieries Co.*, 262 U. S. 341, 344; *United States* v. *Chandler-Dunbar Co.*, *supra; Boom Co.* v. *Patterson, supra.*) But property of the kind we are concerned with here is not dealt in at any market place; it has no ascertainable market price. Therefore, its value must be determined by a consideration of such elements as original cost, replacement value, earning capacity, due weight being given to each but none to be deemed necessarily controlling. (*Smyth* v. *Ames*, 169 U. S. 466, and other cases cited *supra.*)

" The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 327. It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken." (*Seaboard Air Line R. Co.* v. *United States*, 261 U. S. 299; *United States* v. *New River Collieries Co.*, *supra*, 343.)

In my opinion the court is entitled to consider what the property, including the right to impair these easements, originally cost, what it would cost to-day, depreciation, the earning power of the spur, and its value as a component part of the Third avenue system. But none of these elements must necessarily control the judgment of the court, to the exclusion of any other.

" The ascertainment of compensation is a judicial function, and no power exists in any other department of the government to declare what the compensation shall be or to prescribe any binding rule in that regard." (*United States* v. *New River Collieries Co.*, *supra*, 343; *Monongahela Navigation Co.* v. *United States*, *supra*, 312, 327.)

With these general principles in mind, a specific consideration of market value, or exchange value, of the particular parts of the property taken is in order. With respect to the franchise, my view of the elements that must be considered in determining its value has already been stated. Because of the exceptional circum-

stances of the case and the difficulty of determining with any degree of exactness the relative earning power of the spur when considered as a part of an established elevated railroad system, I am of opinion that a strict application of the net earnings rule contended for by the city (*People ex rel. Manhattan R. Co.* v. *Woodbury,* 203 N. Y. 231) cannot be recognized. As already noted, other elements that, in my opinion, lend value to the franchise are before me, and my conclusion is that with these in mind, and upon all the evidence, an allowance therefor must be made. Claimants' expert estimated it to be worth $100,000. I am of opinion that this is excessive and that $25,000 is a fair and reasonable allowance.

The question of the value of the so-called private easements in the possession of the claimants is now to be considered. As already appears, it is clear that the claimants are entitled to their fair market value for all uses and purposes available to them or their grantees. But granting this, my conclusion is that save only in the possible case of the voluntary conveyances, above mentioned, the claimants hold the right to the impairment of the abutting property owners' easements of light, air and access solely for railroad purposes. Respecting the exception noted, I am of opinion that as a practical matter the same limitation applies, because the only conceivable use to which such right is available would be in the hands of one who might be vested with the right to maintain a thoroughfare at the level of the railroad's former structure. While the possibility of such future use of the streets of the city is now a matter of official and public discussion, the value of this right in connection therewith is of so speculative a character that it cannot be regarded as having any value for the purpose of this proceeding. I have, therefore, considered the right acquired by such voluntary conveyances as having a value only for railroad purposes.

But because this right in the possession of the railroad company was limited to the purposes indicated, it does not follow that it is without value. Its acquisition was essential to the maintenance and operation of the company's railroad. Without it the company would have been a trespasser and required to tear down its structure and go out of business. As already appears, its original cost was several hundred thousand dollars.

If the city had condemned the property now being taken within the first few years of the company's franchise, instead of at this late time, could it reasonably and justly have been contended that the railroad company would have been entitled to no award for what had but recently cost its stockholders so large a sum? I am unable to conceive why the claimants should be in any more

unfavorable position with respect to this right and its value at one time than another, except in so far as the reasonable market value thereof might vary with time and change of conditions.

The claimants offered evidence tending to show that if this right were to be acquired on the date when title vested in the city it would have cost the sum of $3,600,000. The city did not attempt to controvert this proof by the testimony of other experts. Presumably, in view of the conceded increase in the city's valuation of the abutting property predicated on the removal of the structure and the fact that the city will later be called upon to sustain such assessments, it could not have successfully asserted that the value given by the claimants' experts was excessive. In fairness to the city, however, it should be noted that its counsel at all times disregarded the claimants' theory and that adopted by me, and for this reason refrained from calling experts on this phase of the case.

Taking into consideration the original and present cost of acquisition, both of which are proper elements to be considered in arriving at the value of the property (*State of Missouri ex rel. S. W. Bell Tel. Co. v. Pub. Serv. Comm.*, 262 U. S. 276; *Georgia R. & Power Co. v. R. R. Comm.*, Id. 625; *Bluefield Co. v. Public Service Commission*, Id. 679; *Banner Milling Co. v. State of New York*, 240 N. Y. 533; *Matter of City of New York*, 198 id. 84. See, also, *Southern Bell Telephone & Telegraph Co. v. Railroad Comm. of S. C.*, 5 Fed. [2d] 77; *Consolidated Gas Co. of New York v. Prendergast*, 6 id. 243; *Brooklyn Union Gas Co. v. Prendergast*, 7 id. 628), the value of the franchise as already found and the elements on which its value is based, the depreciated value of the structure, other considerations heretofore noted, and all evidence before me, I am of opinion that the fair market value to the claimants of the right in perpetuity to the maintenance and operation of its railroad and the impairment in connection therewith of the easements of light, air and access of the abutting property owners, is the sum of $750,000. In reaching this conclusion I have given more weight to the original cost than the reproduction cost, for the reason that in my judgment the value of the railroad has not kept pace with the value of the abutting property.

We now come to the question of the value of the claimants' physical structure in the street and its value, if any. The claimants assert that they are entitled to be compensated on the basis of the fair reproduction value of the structure. The evidence of their experts tended to show that this so-called structural value, or cost of reproduction less depreciation, was the sum of $185,513. The city objected to proof of structural value upon the ground that it was incumbent upon the claimants first to prove that the

spur had an earning capacity, or that a reasonably prudent man would build or purchase the property. The case of *United States* v. *Boston, C. C. & N. Y. Canal Co.* (271 Fed. 877) is relied upon to support this contention. I am of opinion that this authority is not necessarily controlling on the question involved. That decision seems to have turned upon the element of abnormal prices. There is no evidence of abnormal prices in this proceeding. On the other hand, the claimants proved that the structure was suitable for and well adapted to the purposes of an elevated railway. This in my judgment is all that they were required to do. (*Matter of City of New York, supra.*) As I have reached the conclusion that the company's franchise has some value, it necessarily follows that the claimants are entitled to be compensated for the physical structure necessary in its exercise. Structural value is not conclusive, but is some evidence of value. (*Matter of City of New York, supra.*)

The city's evidence tended to show that the structural value was the sum of $120,438. There is thus a difference of approximately $65,000 in the testimony of the experts of the parties; and this difference seems to rest largely upon the fact that the city's experts claim that there has been a greater percentage of depreciation than testified to by the experts of the claimants. In support of its contention that the structure has only " junk " value, the city calls attention to the fact that it was sold to a wrecker by it for the sum of $255, who in turn realized about $6,000 on the resale of the steel girders.

I am of the opinion that the claimants are entitled to substantial damages on account of the taking of their physical structure, and that this value must be based largely upon the structural value. I am of opinion that the value given by the city's experts should be adopted, and I shall, therefore, allow the sum of $120,438 as the value of the structure.

The next question relates to the cost of reconstruction of the station at Forty-second street and Third avenue, rendered necessary by the changes ordered by the Transit Commission. The claimants' evidence tended to show that they have expended a sum in excess of $95,000; that this covers only the changes ordered and deemed necessary by the Transit Commission and does not include the cost of an additional stairway at the southeast corner of Third avenue and Forty-second street not so ordered; that all of such damages and consequent expense were rendered necessary by virtue of the condemnation proceeding.

An estimate of cost of changes deemed necessary by reason of the condemnation was testified to by an expert of the city and was a sum far less than the amount proved on behalf of the claimants. The

city, however, offered no evidence, except to attack the claimants' figures by way of cross-examination, respecting the cost of the work actually done. While I do not regard such cost excessive, I am of opinion that some doubt exists as to whether all of the expense incurred by the claimants was rendered necessary solely by virtue of the condemnation itself, and I have decided to make due allowance therefor. My conclusion is that the sum of $80,000 will be sufficient award in respect to this item of damages.

By stipulation there was tried herewith an action instituted by the claimants subsequent to the commencement of the condemnation proceedings. In such action the claimants sought to enjoin the city from a threatened removal of the structure in Forty-second street upon the ground that it was illegally maintained. A motion for a temporary injunction, brought on in Special Term, Part I, was referred to me by the justice then presiding, and by consent an order was entered granting the temporary injunction, and at the same time the stipulation heretofore referred to was made. No evidence was offered by the city which would tend to establish that the claimants' structure was illegally maintained. Some reference was made to the location of the stairway leading down to the sidewalk in front of the Grand Central Station at the Park avenue station of the spur, and counsel for the city seemed to intimate during the taking of testimony that a certain sum should be deducted from the reproduction cost of the structure because of the alleged illegal position of this stairway. However, if the matter is of any consequence, sufficient allowance has been made therefor in the sum I have allowed as the value of the structure. I am satisfied that the claimants' structure was legally maintained and that the claimants, if such relief were necessary, would have been entitled to the injunction which was sought. The structure now having been removed, the question involved in that action has become academic and I do not deem that any decision or decree therein is necessary. But if counsel disagree they may submit findings and decree in accordance herewith.

The total allowance to the claimants is the sum of $975,438. Proceed accordingly.