In the Matter of the Application of the CITY OF NEW YORK, Appellant and Respondent, Relative to Acquiring Title to the Elevated Railroad in East Forty-second Street in the Borough of Manhattan.

MANHATTAN RAILWAY COMPANY et al., Respondents and Appellants.

(Argued March 6, 1934; decided July 3, 1934.)

*Paul Windels*, *Corporation Counsel* (*Paxton Blair*, *Joseph F. Mulqueen, Jr.*, *William B. R. Faber* and *Reuben Levy* of counsel), for City of New York, appellant and respondent.

*Charles Franklin* and *Edward J. Schmuck* for Manhattan Railway Company, respondent and appellant.

*Charles E. Hughes, Jr.*, *Allen S. Hubbard* and *E. Myron Bull* for receiver of Manhattan Railway Company, respondent and appellant.

*J. Osgood Nichols* and *Carl M. Owen* for receivers of Interborough Rapid Transit Company, respondents and appellants.

*Martin A. Schenck*, *Edward Cornell* and *Harold C. McCollom* for Central Hanover Bank and Trust Company, as trustee, respondent and appellant.

*William H. Page*, *Richard M. Page*, *John G. Dalton*, *P. A. Carroll*, *Thomas H. Baskerville*, *Herbert H. Maass*

and *Edmund W. Van Voorhis* for Bowman Biltmore Hotels Corporation et al., respondents and appellants.

*Ellwood Thomas* and *Albert S. Wright* for Cooper Union for the Advancement of Science and Art, respondent and appellant.

*Wilber Stammler* and *George Welwood Murray* for Chase National Bank of the City of New York, as trustee, respondent and appellant.

POUND, Ch. J. The Forty-second street spur of the Third Avenue Elevated Railroad, extending from Third

avenue to the Grand Central Railway Station, has been taken down by compulsion of law. Protracted litigation has ensued over the amount of money the company should receive for such taking. The mandatory law is chapter 611 of the Laws of 1919, as amended by chapter 635 of the Laws of 1923. Pursuant to its provisions the Public Service Commission determined that the spur was no longer necessary or convenient for the public service and that it constituted an impediment and obstruction to the public use of the street. After this finding the city commenced these proceedings to condemn and remove the property. Title vested December 7, 1923, and the structure was removed in the spring of 1924. The condemnation proceedings have been pending ever since.

The Manhattan Railway Company owns the Elevated roads which it leased in 1903 to the Interborough Rapid Transit Company for 999 years. The Central Union Trust Company and the Equitable Trust Company are trustees under the Manhattan consolidated and second mortgages. William Roberts was appointed receiver of the Manhattan Railway Company September 6, 1932.

The questions involved on this appeal are novel and important. The railroads claim $6,500,000. They have been allowed about one-tenth of that amount. Their claims are large considering that it was their desire to escape the maintenance and operation of the Forty-second street spur.

There are three groups of parties: (a) The railroad interests; (b) the city, and (c) the abutting owners. The decision below satisfies none of them. All appear here as appellants.

The legislation leading up to the judgment herein is fully stated in the opinion of Mr. Justice O'Malley on the first hearing (126 Misc. Rep. 879); reversed (229 App. Div. 617) and new hearing ordered. The ultimate question is, How much must the city of New York pay to get the

elevated structure out of Forty-second street? The railroads have a State and city street franchise and an elevated structure and the right to interfere with the light, air and access of abutting owners. What is the difference in the total value of such rights in perpetuity and as thus terminated?

The franchise, both from the State and the city, had its origin in the Rapid Transit Act (Laws of 1875, ch. 606). It dates from September 7, 1875, and vests the railway "with an interest in the street in perpetuity" for the purpose of an elevated railroad. Long after the acquisition of the street franchise it was held that private easements of light, air and access, where the city did not own the abutting property, were not the property of the city but of the abutting owners. (*Story* v. *New York Elevated R. R. Co.*, 90 N. Y. 122.) The railroad thereafter acquired title to these easements at large expense. The railroad companies now claim that these easements are real estate, separate and distinct from the railroads and that they are entitled to compensation therefor at the market value thereof at the time of the present taking, for the reason that the removal of the elevated structure restores these easements to the abutting owners, greatly enhances the value of such property and thus deprives the railroads of the value of their property therein.

The contention of the city is that these easements are of no value without the railroad. In brief its position is: "The railway company owned at the time title vested in the city in this proceeding (a) a franchise, (b) an elevated railroad structure, (c) *and the right to maintain the structure for railroad purposes without liability to the abutting owners,* the three constituting one entire property,— a railroad in a public street."

It was held in substance in *Kernochan* v. *New York Elevated R. R. Co.* (128 N. Y. 559) that the easements were appurtenant to the premises themselves and could

not be owned separately and distinctly. Quite apart from the discussion of the cases, it is clear that the railroad merely exhausted the right of the abutting owners to complain because the railroad was in the street and so trespassing on their property. The railroad as such possesses a right to impair the easements by the operation of its road. If it did not have such rights it would be guilty of an injury to the inheritance.

O'MALLEY, J., held that these property rights, whatever they might be called, vested in the railroad, so that it is entitled to be compensated therefor, whether considered as an ownership separate and distinct from the franchise or as considered as a value measured only by the limited railroad use granted by the franchises. He held that the rights as such had no market value but that the value must be found by considering original cost, replacement value and earning capacity. The claimants demand an award for these rights of $3,600,000, the amount that it would cost them to acquire such rights on the date when title vested in the city under the legislation under consideration. O'MALLEY, J., on his theory fixed the value of such rights at $750,000. The Appellate Division held that the rights to impair light, air and access appurtenant to the property abutting on Forty-second street at the time of vesting of title herein should be valued upon the basis of the value judicially determined at the time of the original acquisition of those rights. The Special Term on the new hearing thereupon placed a value on such rights of $539,117.40. This has been affirmed by the Appellate Division and is now before us for review. The judgment of O'MALLEY, J., is not before us for review, as it is not an intermediate order subject to review on this appeal.

The railroads claim here as below that the court erred in failing to award the full market value of the private easements acquired by the railroad company. Such value should be applied only if the railroad is operated as a

going concern and it cannot be so operated unless it owns such rights as it acquired in 1877 or thereabouts.

In other words, the property in such easements, strictly speaking, is of no value to the railroads when the railroad ceases to operate and is taken out of the street, but the city should reimburse the railroads for what it cost them to acquire such easements when it terminates the right of use in perpetuity. The decision of the court below awards the railroads fair compensation. The contention of the city, that the railroads are entitled to no compensation, is based on the argument that these rights were of no use to the railroads except as they were compelled to acquire them to operate and of no value except to a going concern, has some logical force, but such rights were obtained in order to permit the roads to exercise their franchise in the street in perpetuity, and when the city terminated such rights it should fairly compensate the roads for the loss of such rights.

The language of the many opinions in the elevated railroad cases is not helpful in dealing with this problem. The decisions are conflicting and deal with a different problem. What is the right which the roads acquired to exercise their street franchise in perpetuity as against the abutting owners worth when the right to operate the elevated road is taken from them? It is as extreme to say "nothing" as to say that their property in the easements is property entirely distinct from the right to maintain the elevated structure, the same as if the abutting owners still owned them. That these easements would be worth $3,600,000 to the abutting owners if they now owned them is beside the point. What is the city taking from the railroads? That is the question. The railroads could not release their rights to the abutting owners and continue to operate their railroads in the street. It, therefore, acquired no real title to these easements apart apart from the operation of its road. They otherwise still attach to the property of the abutting owners.

We next come to the value of the street franchise itself. O'MALLEY, J., found that it had a value based on productiveness and that present earning power and reasonable prospective value should be considered. The Appellate Division held: "The franchise to build, maintain and operate the spur is of no value, since the spur can no longer be operated except at an annual loss and the taking by the city is a distinct benefit to the claimants since the Public Service Commission has determined that the spur is no longer necessary and convenient for public service."

It is difficult to see what the railroad has lost by the taking of its street franchise. It has gained relief from the burden of operating the road. What would any one pay for the franchise apart from the right to occupy the street? Should it receive more for its franchise when the spur can be operated only at a large annual loss? Of course it might possibly sometime gain some additional revenue if allowed to operate in perpetuity this spur in connection with the operation of its entire line. The railroad cannot claim a lack of profit, in rate fixing cases, on each part of its road. The whole system was operated at a profit but the finding that the Forty-second street franchise had no value should not be disturbed. While potentially traffic might be driven to the elevated by the congestion of the subways and the spur might have value as a traffic originating line such value is too speculative to be considered.

Next comes the question of the award for the structures in the street. O'MALLEY, J., held that the railroads were entitled to substantial award based on reproduction cost. The Appellate Division held that junk value was all that should be allowed; nuisance value or what the illegal structure was worth when taken down. The right to have the structure in the street was worthless if the street franchise was terminated. The structures had only a nuisance value when the right to have them in the street ended.

On the whole, a fair valuation of the property taken is the amount awarded by the Appellate Division.

The order should be affirmed, without costs.

LEHMAN, J. (dissenting). The Forty-second street spur of the elevated railroad was erected and maintained under a franchise and permission granted by the city and State of New York. It has been removed under compulsion of the law. It is said that a duty to continue the maintenance and operation of the railroad would have been a burden rather than a privilege. The railroad company did not ask to be relieved of that duty. The structure in the street was the property of the railway company, constructed and paid for by that company. The right to erect and maintain that structure was granted by the sovereign. Even after that grant, the railway company was compelled to pay large sums to abutting owners for the right to obstruct permanently the easement of light, air and access which the abutting owners had in the city street. The sovereign State has compelled the removal of the railway structure from the street, and thus the easement of the abutting owners was relieved of the obstruction for which compensation had been paid by the railway company. The State has the power to revoke the franchise it had previously granted, but that power is subject to the constitutional limitation that it must pay fair compensation for property taken or destroyed in the exercise of its sovereign power.

The elevated railroad structure and the right to maintain and operate it constitute the property of the railway company which has been taken or destroyed by the State. The structure could not have been erected and operated lawfully in the public street without a public franchise; but in addition it was necessary to acquire from abutting owners of land, property rights which would be infringed by such a structure. The structure itself, the right to maintain and operate it, with the consequent obstruction,

or partial destruction, of the easements in the street of the abutting owners were inseparable parts of that property. None would have value except in connection with the others. The value of the whole cannot be determined by placing separate value upon the parts — for the dismembered parts have no separate value.

Nevertheless, the Appellate Division upon the first appeal has attempted to fix the value of the property of the railway company by fixing separately the value of the inseparable parts of the railway company's property. It has determined that the public franchise is valueless because the spur cannot be profitably operated. For the same reason it has determined that the structure is valueless for use as a railway, and is worth only the amount which could be salvaged after it has been taken down. Finally, it has determined that the property rights which the railway company has acquired in the abutting land should be valued upon the basis of the value judicially determined in connection with proceedings brought at the time of the original acquisition of such rights. Upon the second trial the court was constrained to follow the rule laid down by the Appellate Division. The award is based upon a valuation fixed accordingly.

The determination of the value of property presents a practical problem. It cannot be solved by definition, classification or formulas. Where property exactly similar can be readily bought and sold in an open market, the market price fixes the value of the property. The value fixed by the consensus of opinion of ready buyers and willing sellers in the open market may be evanescent, for that consensus of opinion may be based upon premises and anticipations which are proven false by the passage of time. None the less, where there is a real market in which there is a constant stream of ready buyers and willing sellers, the market price does, for the time at least, fix accurately the value of property; because property can never be worth more than the price at which exactly

similar property can be readily acquired, nor less than the price at which it can be readily sold.

Of course, the value of an elevated railway structure in a public street cannot be fixed in such manner. There is no other property exactly similar to it. As a railway spur it could be operated only in connection with the main railway line of the railway company. No other corporation or person would be willing to buy it for use as a railroad, and after the structure has been removed from the street by command of the sovereign the railway company can never through purchase or construction replace that spur.

Where market price furnishes no standard by which value can be measured, we must seek other practical criteria. In taking the elevated railroad structure out of the street of the city, the state deprives the railway company of its right to use that structure as a railroad spur in connection with the main railroad line, and at the same time deprives the railway company of its alternative right, if any, to sell the railroad structure to a third person or persons. The value of the use to the railway company of its property for railroad purposes and the value of the property for sale to others constitute the practical criteria by which the value of the property can be measured. I can conceive of no other practical criteria.

The Appellate Division has, as I have pointed out, determined that the structure has no value for use as a railroad and that the structure otherwise had no value except for junk. I will assume that the evidence sustains a finding that the structure had little or no value for use as a railroad, and the value of the structure as junk was unsubstantial. Certainly the award of over six hundred thousand dollars is erroneous and must be reversed upon the city's appeal if the value of the use of the structure for railroad purposes and the value of the structure as junk together constitute the value of the property taken by the authority of the State. The Appellate Division,

of course, did not so hold. It gave an independent value to the railway company's property rights in the abutting land, and authorized a substantial award for them.

Classification of these rights cannot guide us in fixing their value. That depends upon the use to which they could be put in connection with the railroad structure, or the price which a willing buyer would pay for their abandonment. If that structure is destroyed forever, then user of these rights is destroyed forever. Their user for railroad purposes may be unprofitable. Then the question must arise whether the State may compel their abandonment without compensation.

The railway company acquired these rights over fifty years ago from the owners of abutting property by compulsion under the authority of the State. In some cases the value was fixed by the courts; in other cases it was fixed by agreement of parties, but, doubtless, even in such cases the amount agreed upon constituted a rough estimate of the value which the courts would fix if the question were left to them. The measure of value adopted was the diminution of the value of the property suffered through the erection and maintenance of the railroad structure. Conditions have changed since that time. Values of real property in New York increased vastly in the interval. Forty-second street has become a great business thoroughfare. The real property abutting thereon has been improved by the erection of buildings which in size and cost exceed any anticipation that could have been formed fifty years ago. If the railway company now desired to acquire these rights at a value determined by the diminution of value of the abutting property caused by the erection and maintenance of the railroad structure, it would be compelled to pay vastly more. If the railway company is compelled to abandon the structure, it will restore to the abutting property a value vastly greater than the original cost of the rights.

Perhaps in fixing a reasonable return upon the investment of a public utility company, original cost may be a relevant factor in determining the value of the investment. It seems to me irrelevant in fixing the value of property which is taken *in invitum*. Then the relevant factors are what would it cost to replace the property and the value of its possible use, assuming that a reasonably prudent person would be willing to pay that cost for such user, or if not, either the value of the user of these rights or the amount which a willing buyer would pay for the abandonment of these rights.

It is clear, I think, that if the railway company were not compelled to abandon the structure, the abutting owners would be willing to pay the railway company a very substantial amount for its abandonment with its consequent accretion of great additional value to their land and buildings. That amount would constitute the realizable value of the railroad property to its owner, even if its user for railroad purposes were unprofitable and a burden upon the owner.

It is suggested that what I have called "realizable value" is, in fact, only "nuisance value;" that is, the amount which an owner can exact as the price for refraining from injury, rather than the price of a right of property which the owner can exercise for a legitimate purpose. The suggestion may not be lightly cast aside. One of the objects of the exercise of the power of condemnation of private property for a public use is to prevent an owner of property from exacting more than the value which a ready seller could obtain from a willing buyer. The power to injure the value of neighboring property may come through ownership of property, but is not itself a property right nor an element in the value of property which the courts must recognize when they fix the compensation to be paid when the property is taken under the command of the sovereign.

The payment of all the damages which flow from a wrong constitutes full satisfaction for the injury done. As between the parties, such payment obliterates the injury; and the injured party cannot, usually, complain of the wrong for which he has been paid full compensation. It does not, however, result in any accretion of value to the property of the wrongdoer or a transfer of a property right to him out of the real property of the injured party. In many respects the payment by the railway company to the abutting owners is analogous to the payment of damages for wrongful injury, but not in all respects. If the city had possessed an unrestricted fee in the streets, the erection of the railroad spur under the franchise granted by city and State would have caused consequential damages to the abutting property, but no award was, or could have been, made to the owners for such consequential damages. They were entitled to an award because the railroad structure burdened or partially destroyed an easement on the public streets, which, this court has held, was appurtenant to property abutting in the street. The erection of the railroad structure could, therefore, not be authorized by the State and city without grant from the owners of the easement, and the awards to the abutting owners was the compensation paid to them for such grants.

It may be urged that since the determination of the value of property presents, as I have said, a practical problem, the juridical concepts underlying an award of damages which, otherwise, carry no practical consesequences, must be disregarded. The difficulty here is that these juridical concepts do carry practical consequences. They resulted in an increase of the legitimate cost of a public improvement, and the money to meet that cost was furnished by investors who purchased the stocks and bonds of the railway company, believing that the railway property was worth at least the expense necessarily and prudently incurred in acquiring the

property. Certainly in determining the reasonable rate that could be charged, the value of the property rights which a railway company must acquire, before it could erect and maintain its railway, could not be disregarded. Finally, and most significant, is the fact that the rights which the railway company was compelled to acquire from the abutting owners constituted property which is subject to assessment for taxation (*People ex rel. Manhattan Ry. Co.* v. *Barker,* 165 N. Y. 305), and, it must be noted, this court arrived at that conclusion because of the distinction it drew between payment of consequential damages and payments made by the railway company for a grant from the owners of an easement in the street.

True, the right of property thus acquired is in the nature of an easement or an interest in an easement, which has become inseparably attached to the railroad structure, just as an easement is appurtenant to a particular piece of real property; and it could not be used or granted except in connection with the railroad structure. None the less the property right of the railway company, however we may describe it, rests, like an easement, upon grant from the owner of the real property upon which it is a burden, and, like an easement, may be terminated by grant to the owner of the burdened property or by other instrument or act of like effect.

It seems to me quite plain that the city cannot be compelled to pay to the railway company any value for these rights beyond the value which the railway company could enjoy through user or sale. The amount paid for such rights, whether fixed by agreement or by judicial decree, furnishes no true measure of such value. It seems to me scarcely less plain that the city may not be permitted to pay for a taking of property which terminates the user of these rights, less than the value which might have been enjoyed through user or as the price of a grant to a grantee ready and willing to pay such price. After the owner has been compelled to pay for the acqui-

sition of these rights because the courts have held that they were property rights, and after such rights have been made subject to taxation by the State because they constitute property rights, it seems to me too late for the State to urge that it may destroy these rights without paying for them the value which the owner could otherwise have obtained as the price of their sale or abandonment. So, too, it seems to me inequitable to permit the owners of the abutting property to urge that these rights have only a nuisance value for which no compensation should be given when their predecessors in title have received compensation for a grant of these rights.

To fix the value which might be derived from a sale of these rights would doubtless present a difficult problem. Perhaps by the same methods which the courts employed in determining the diminution in the value of abutting property caused by the burdening of the appurtenant easement in the street, the courts could now determine the increment to the value of the abutting property caused by the removal of that burden. It does not follow that the owner of the abutting property would be willing or compelled to pay that price to secure the increment in value. Just as we may say with reasonable certainty that the railway company would not accept that price if the railroad were operated at a profit, so with like certainty we may say that the railway company would accept a much smaller price for the retransfer or abandonment of its rights to maintain the railroad structure if the operation were a burden. The courts must assume that both parties to a transaction will act reasonably. If the abutting owners and the railway company fixed the price by agreement, both sides would be called upon to use their business judgment. Business judgment is not fettered by rigid formulas, nor can a definite measure be applied to all the considerations which may enter. The court must determine, as a question of fact, in fixing values which depend upon business judgment, the price

which would be fixed by negotiation between reasonable business men seeking profit. The amount fixed by the courts below as the present value of the property rights bears no relation to any value which might be obtained from user of the property, or as the price of its abandonment or transfer. It is purely arbitrary. It may be greater or less than the value. Property is taken without due process of law when the compensation paid is fixed arbitrarily rather than by a determination of the value which might be obtained from user and sale.

Thus the order of the Appellate Division must be reversed upon the appeal of the city, if the railway's property rights in the street have no value which the law recognizes, and must be reversed upon the appeal of the railway company if those rights have a value which could be realized as the price of sale or abandonment.

CRANE, O'BRIEN and CROUCH, JJ., concur with POUND, Ch. J.; LEHMAN, J., dissents in opinion in which HUBBS, J., concurs.

Order affirmed.