**UNITED STATES v. 25.4 ACRES OF LAND, MORE OR LESS, IN BOROUGH OF BROOKLYN, KINGS COUNTY et al.**
**UNITED STATES v. 53¼ ACRES OF LAND, MORE OR LESS, IN BOROUGH OF BROOKLYN, KINGS COUNTY et al.**

Nos. 586, 494.

United States District Court
E. D. New York.
April 6, 1949.

434

See also 82 F.Supp. 394 and 538.

Harry T. Dolan, Sp. Asst. to Atty. Gen. of the United States, for the United States.

Cullen & Dykman, of Brooklyn, N. Y. (Jackson A. Dykman, Sigourney B. Olney and Augustus J. Wheeler, all of Brooklyn, N. Y., of counsel), for claimant Brooklyn Union Gas Co.

Beardsley & Taylor, of New York City (Cameron F. MacRae and Earl G. Clarke, both of New York City, of counsel), for claimant Consolidated Edison Co. of New York.

BYERS, District Judge.

This cause is most recently reported in United States v. Brooklyn Union Gas Co., 2 Cir., 168 F.2d 391, and is now before the Court pursuant to reversal and remand for further proceedings consistent with the opinion of the Court of Appeals.

The factual situation has been sufficiently recited to forbid repetition, and attention will be confined to the erroneous elements of the decision of this Court as pointed out in review, and the extent to which deficiencies of prior proof may be deemed to have been overcome in the record as now constituted.

The errors are referred to in the said opinion as follows:

168 F.2d on page 395, as "the fallacy * * * permeating the decision rendered, of identifying their (the claimants') loss with the curtailment of their physical facilities".

Again, 168 F.2d at page 396: "* * * the district court * * * got itself into the position of assuming a loss before one was proven and of measuring it by the extent of curtailment of the facilities." (This passage occurs in a comment upon the Scharff expert opinion which was said to have been accompanied by an accumulation of "imprecise theory".)

Finally, 168 F.2d on page 397, it is said that this court erred in declining to consider, as indicative of the value of the claimants' properties on the days of taking (April 1, 1941, and September 19, 1941), the subsequent consumption of gas and electric current within the area condemned, through the Government's own facilities, which were therein installed after the Navy Yard had been enlarged by the land so acquired. Thus: "We think the evidence admissible not as a standard of value in itself, but for its bearing upon the prospective values at the time of taking."

This seems to import into the value at the critical dates an element of futurity which perhaps is always present in such questions in the sense that all enduring values embrace a factor of potentiality. This court is admonished not to reach a conclusion mechanically, 168 F.2d page 398, which probably implies that formulae should not be ingenuously adopted; the same warning is perhaps appropriate also in the semantic sense.

The present problem is thought to resolve itself into an attempt to fairly decide whether the taking by the Government of these claimants' sub-surface structures, as clothed with the franchise to operate them for profit, visited a loss upon the claimants for which compensation is required to be made, under the Fifth Amendment to the Constitution.

While the fact of taking is not in dispute, this court may not conclude that their earning capacity, which was ipso facto de-

molished, can be deemed to constitute a loss, if in fact the claimants were benefited as the result of the practice of this form of surgery by the sovereign. That is, if a new and profitable earning capacity was thereafter imparted to what remained to the claimants of the unappropriated balance of their properties; this approach is deemed to be required, apparently because what was here taken included only part, instead of the whole, of their franchises, as was shown in the Monongahela Navigation Company v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463.

If the present task is correctly understood, it is necessary to remember additionally the suggestion, 168 F.2d page 395: " * * * while a franchise must be valued as property in condemnation proceedings, its value is to be based * * * upon what as a matter of business judgment would be considered its worth, if not in sale, at least as a producer of earnings."

This court cannot profess to possess business judgment, any more than the capacity to tell, for instance, whether patentable invention is presented in a given disclosure, or whether a ship has been properly navigated. All it can undertake is to offer a conclusion that in a given controversy the evidence is thought to preponderate one way or the other; it is often held to be mistaken in failing to grasp what the evidence really teaches, or indeed what it is. Such lapses are presumptively rectified in the appellate process.

This is a case in which affirmative testimony has been offered on one side only, since the position of the Government is that no proof is required from it to offset the case for the claimants; in other words, that their testimony adds up to zero.

If that is a sound conclusion, I confess to an inability to grasp it, for reasons about to be stated. It will be convenient to discuss the elements of proof under separate headings:

I. The productiveness (i. e. capacity to produce earnings) of these properties within the area taken, in the year 1940:

A. As to Brooklyn Union Gas Company, the figure of $3,956.00 appears in B.U.G. Exhibit 17, and is not controverted.

B. As to Consolidated Edison Company, the 1940 figure of $17,558.22 appears in Edison Exhibit 24, and also is not controverted.

It results that, as to the capacity of these properties, i. e., the franchises and the instrumentalities of their exercise, to produce earnings in the last year prior to the taking, nothing is left in doubt; and that capacity has been recorded in dollars, in the accounting records of each claimant. Thus is established a fundamental difference between these properties and the losing operation of an elevated railroad spur. Matter of Application of City of New York In re Acquiring Title to Elevated Railroad, etc., 265 N.Y. 170, 192 N.E. 188.

It seems equally clear that these takings necessarily meant a loss of their capacity to produce earnings, and it is not understood that the Court of Appeals held to the contrary; but it did rule that the loss would be compensable only if it were shown that operations of the claimants during subsequent years, through sales of gas and electric current within the area taken, were not so profitable as to offset or perhaps exceed the revealed capacity to produce earnings on the part of the properties condemned. If it be argued that this smacks of condoning confiscation, provided only it brings about enhanced income to the condemnee, the answer is that such is understood to be the law of this case which this court is required to apply.

II. The actual experience of these claimants in sales made to the Government, of gas and electricity within the area taken, subsequent to the dates of taking (April 1, 1941; September 19, 1941), namely, 1942–1948:

A. As to Brooklyn Union Gas Company:

The figures appear in B.U.G. Exhibit 25, and show actual operating revenues, production costs, maintenance expenses, taxes and net revenue for each year. The bases of allocation are explained with reference to Exhibit 24, later to be referred to, and these accounting practices are not sought to be discredited.

The upshot of this Exhibit can be tabulated as follows:

| Year | Net Revenue (Capacity to produce earnings) | Loss |
|------|------|------|
| 1942 | $617.11 |  |
| 1943 | 934.31 |  |
| 1944 | 1,096.73 | War years. |
| 1945 | 549.32 |  |
| 1946 |  | $12.49 |
| 1947 |  | 308.23 |
| 1948 |  | 15.02 |

These figures are to be compared with those of 1940 ($3,956), which was not a war year.

B. As to Consolidated Edison Company:

The income produced from sales of electric current to the Navy Yard for the years 1942–1947, inclusive, are shown on Edison Exhibit 27, as follows:

| Year | Net Income | Loss |
|------|------|------|
| 1942 |  | $14,796.31 |
| 1943 | *$51,347.32 |  |
| 1944 |  | 81,960.49 |
| 1945 |  | 77,353.03 |
| 1946 |  | 13,490.34 |
| 1947 |  | 7,916.59 |
|  |  | $195,516.76 |

Note: 1948 figures had not been compiled by January 20 1949, when the testimony was taken.

The bases upon which revenues and costs of operation, maintenance, depreciation, and taxes have been allocated, were explained in detail, and again there is no testimony calculated to impair or discredit these accounting practices. For the six years involved, the net loss is computed to be $144,169.44; there having been profit only in one of those years as shown.

It will be recalled that the net revenue for this company in 1940 was $17,558.22.

These figures are criticised by the Government, not for inaccuracy, but because it is hard to understand why this company should have continued to supply current to the Government at a loss, when the contract under which this was done could have been cancelled.

It will perhaps not be overlooked that this argument means that one department of the Government should not be called upon to make just compensation for property condemned, because another department was able to negotiate a contract for current that was the cause of loss to the claimant, which is beside the point.

This court was called upon to inquire into operations in the future, looking forward from 1941, as they were conducted, not as they might have been, if several other things had happened.

The difficulty is inherent in the process of establishing a 1941 valuation in the light of later developments, a concept for which this court is not responsible.

The only element of business judgment involved in the acceptance of the figures thus far set forth concerns the accounting practices which support the various allocations employed. In the absence of informed instruction to the contrary, no reason suggests itself for refusing to proceed to decision herein upon the figures so revealed.

III. Since the capacity to produce earnings on the part of the properties taken has not been replaced by equal or greater earnings arising from subsequent sales by the claimants in the area taken, is loss of that capacity susceptible of valuation for compensatory purposes?

The opinion for reversal is consistent with the view that an affirmative answer is possible, or the claims would have been dismissed in the reviewing court. The argument of the Government, that, absent proof of substitute facilities, no award can be made, is refuted at page 394 [168 F.2d] of the Court's opinion.

The very nature of this taking destroyed any chance for the claimants thereafter to do the same thing which they had been doing, but in another or substituted way.

This consideration somewhat emphasizes the difficulty of including, in a valuation at taking, prospects of future earnings, since no comparison can be made between the performance by the claimants during 1940, and a like subsequent performance by the Government. Had the latter acquired the

---

* This figure was established after deduction of income taxes for that year, amounting to $21,755.36, the figure before taxes being $73,102.68.

70 acres merely to prevent their falling into undesirable ownership, and continued to supply gas and electricity to the former occupants, a true standard of comparison could have been made, which has not been possible under the circumstances as they actually prevailed.

It does not follow, however, that because valuation is difficult, it need not be undertaken at all.

By this time the court has accumulated a considerable volume of data which can be consulted in the effort to formulate something of substance upon which to base a reasonably compensatory award.

At the first hearing, replacement values of the structures, less depreciation, were stated. Even though a theory of compensation based thereon was not deemed available, for reasons explained in D.C., 65 F. Supp. 333, the fact remains that it was shown that, on the days of taking, each claimant had actually and in good faith expended considerable sums of money in installing the instrumentalities of distribution of gas and electricity which were then functioning under franchises, and which were rendered thereby practically valueless as to both aspects of the property.

At the second hearing, the expert Scharff whose qualifications were not impaired by anything shown in the record, and who impressed me as a technically informed person, expressed his opinion as to a fair measure of compensation to be paid for the taking of these properties and franchises. His testimony is somewhat discussed in the opinion which appears in D. C., 71 Fed.Supp. 248, at page 252 et seq., and consequently need not be further expounded. It has not been overlooked that his estimates have been characterized as being accompanied by "an accumulation of imprecise theory".

That statement may not be ignored by this court, but the Government has not developed it for present purposes, i. e., the imprecise theories have not been identified or discussed in any analytical sense.

Nor have contrasting theories been advanced by any witness except Mr. Shlichta, who thought that the useful life of these properties in their dual aspect was from 15 to 20 years, instead of the 40 years attributed to them by Mr. Scharff. Since the court used a 20-year period because that measures what is usually called a generation, it seems, with all deference, that Scharff's opinion has indeed not been discredited. Since it was an opinion and could be nothing more, and since it was offered by one whose training and experience invite respectful attention, I am aware of no reason why it should not be consulted by this court in reaching a conclusion.

At the third hearing, the claimants offered proof taken from their records of the capacity of the respective properties and franchises taken, to produce earnings according to 1940 figures, for an additional period of 20 years, or what would have happened had there been no taking in condemnation.

This means the respective capacities to so produce as shown for the year 1940, and the value thereof as computed before the taking, based upon a 20-year expectancy.

A. As to the Brooklyn Union Gas Company, in the area taken, the showing by years as per B.U.G. Exhibit 25 has already been alluded to in terms of net earnings. That Exhibit also shows the volume in M. C.F. (1,000 cubic feet).

B.U.G. Exhibit 29 contains the same information, but includes figures for the Navy Yard as a whole, as distinguished from the area taken in this proceeding.

For the sake of full disclosure of all possible data, figures are submitted to demonstrate:

1. Earnings from sales in the area taken.

2. Ditto as to sales in the balance of the Navy Yard in excess of the 1940 level of sales, which is clearly requisite for intelligent comparison.

3. Contrast of earnings with the results of all sales in the entire Navy Yard.

The applicable data will be found in B. U.G. Exhibit 24 and supporting schedules. The showing is of the effect thereof on this claimant's earnings based upon gross revenues and the saving of taxes and expense in the years following the taking.

B.U.G. Exhibit 24 uses the 1941 figures showing the net revenue produced by sales to customers in the area taken, and assumes a continuance of that volume for

each year through 1948. No other assumption would be helpful since it is impossible to state whether wider employment of gas for space heating in the conduct of the various properties would or would not have come about; nor whether there would have been more or less customers. We do know that the consumption of food did not decline while the population of Brooklyn was constantly on the increase.

That assumed volume of business was contrasted with the results of actual operations in the area taken and in the Yard as a whole, for purposes previously stated. B.U.G. Exhibits 25, 26, 27, 28, 29, 30, 31, and 32 may be consulted to reveal the analyses which have been prepared for the information of the court.

The 1941 worth of the loss of earnings for the years 1942 to 1948 was thus estimated as follows:

| | | |
|---|---|---|
| 1942 | ...............$3,300.66 | |
| 1943 | ............... 2,717.15 | |
| 1944 | ............... 2,495.76 | |
| 1945 | ............... 2,680.81 | |
| 1946 | ............... 2,869.73 | |
| 1947 | ............... 2,336.30 | |
| 1948 | ............... 2,189.52 | $18,589.93 |

As to the remaining period to make up twenty years, the year 1946 was selected as the first non-war year and thus the nearest to normal for the purpose of estimate; the 1946 loss of earnings was shown to be $3,-840.12 ($3,827.64 plus $12.48, Ex. 26), and discounted to 1941 by straight annuity factor 8.8527 yields $22,610.42 as the estimated loss so computed, from 1949 to 1961, or a total loss for the 20-year period of $41,-200.35.

If, however, similar computations are made, based upon Navy Yard consumption as a whole, on the theory that thereby useful results can be obtained in seeking to establish a fair value for the property taken within the area condemned (See reference in the Court of Appeals' opinion, page 397, second paragraph in first column, as to giving consideration to the "effect of the taking upon the owner's nearby property".), the showing of B.U.G. Exhibits 29, 30, 31 and 32 will be found to be expository.

The result may be thus tabulated:

1941 Worth of Loss of Earnings, 1942–1948, inclusive

| | | |
|---|---|---|
| 1942 | ...............$ 5.61 | |
| 1943 | ............... 1,846.35 | |
| 1944 | ............... 1,835.25 | |
| 1945 | ............... 2,770.48 | |
| 1946 | ............... 2,869.73 | |
| 1947 | ............... 2,336.40 | |
| 1948 | ............... 2,189.52 | $13,853.34 |

This sum, added to the 1946 showing as explained above, discounted to 1941 and computed on the same straight annuity factor, gives $22,610.42 for a total 1941 value of the 20-year loss as $36,463.76.

This is a convenient place to discuss the argument made for the Government that a declining rather than a straight annuity factor should be employed, since extinction at the end of 20 years would be gradual rather than sudden and abrupt. The straight annuity is preferred for the reason that the 20 instead of the 40 year period was adopted by the Court, although the latter would seem to measure more accurately the physical life of the structures according to experience. A declining annuity for 40 years would therefore be consistent with the testimony, while the 20-year period somewhat flies in the face of it. If present judgment is relevant, it is that the effort to visualize the area served by the condemned properties, and the growth of population, and the necessity for making use of all available space for human habitation during the foreseeable future for 20 years following 1941, combined with what is presently understood of the increasing use of both gas and electric current, point to the wisdom of employing the straight annuity factor rather than one which postulates a constantly accelerated extinction of what probably would not have suffered such a fate.

The Government's case is necessarily argumentative as to what would have happened to the property condemned in this proceeding, had the Government not taken it for an addition to the Navy Yard.

It is true that, within the market area, in the years just prior to 1941 there were vacancies and a reduction in ground rents charged by the City. The experience of the Edison Company, however, points to a

constantly increasing use of current during that very period, i. e., the years 1937 to 1940. Gas Company figures are not available prior to 1940, since pertinent records were destroyed in the ordinary course of business.

It seems that the City received an award for this property of $5,000,000, and I find it difficult to believe that so considerable an area (70 acres) would have lain fallow, even if all the Wallabout Market renters, for one reason or another, had betaken themselves elsewhere. Nothing on this subject is argued about the Kent Avenue addition. Housing accommodations in this part of Brooklyn have not become adequate in spite of the nearby Fort Greene Housing development.

All this of course lies in the realm of conjecture, but once that practice has been judicially encouraged, the recall to the requirements of the moment, namely, the dates of taking in 1941, is ever the more diffident.

However much it be urged that the figures which have been recounted are but the mathematical statement of computations, the fact is that they have an incontestable basis of actuality for the years immediately before the taking of these properties. The computations themselves have not been discredited as such, nor have they been analyzed with a view to disclosing errors of premise or blemish in conclusion. At least, they demonstrate that there was reason in ascribing a tangible and substantial value to the properties of this claimant which were taken by the Government in 1941, and for which no compensation has been made.

B. As to the Consolidated Edison Company:

Using the consumption of current for 1940 as a base, and calculating the revenues and expenses of operation, maintenance, depreciation and taxes as established for that year, the apparent results so calculated for 1942–1947, inclusive, were shown to be:

| | Net Income |
|---|---|
| 1942 | $14,936.00 |
| 1943 | 16,022.50 |
| 1944 | 14,331.15 |
| 1945 | 15,092.35 |
| 1946 | 13,705.53 |
| 1947 | 15,162.79 |

As to the foregoing, there was no opposing evidence.

The post-taking consumption of current in the Navy Yard, in the buildings erected in 1941 and later, was distributed through facilities constructed by the Navy Department; some was similarly generated, and some was purchased from this claimant and conducted through high tension feeders from Edison plants. This means that there was no way to distinguish the source of current consumed within the area taken, from that elsewhere consumed in the Yard as a whole.

By the end of 1948, it appears that the Navy was no longer in need of current generated by the Edison Company. The circumstances recording this development appear in the evidence. This means that the loss shown by the figures heretofore discussed may be deemed to have come to an end with December 31, 1948, and that no further sale of current by the claimant to the Navy within the area was contemplated.

In the effort to assign a value to the demonstrated capacity of these properties to produce earnings, testimony was offered to the following effect:

That the average net revenue for the years 1940 to 1947, inclusive, was computed to be in round figures $15,400, on the assumption of the continuance of the volume of business for 1940. (The net revenue for that year was $17,558.22, it will be recalled.)

The present value of a 6% 20-year annuity yielding the average figures would be $176,000. The testimony at the prior hearing vindicates that rate for public utilities. A lower rate would of course increase the present value of such an annuity.

Allowance is made for an allocation of net earnings traceable to operations of property and franchise exterior to the area taken which contributed to the consumption interior to it; the allocation was 61.75 per cent. to the franchise and properties within the area, whereby the applicable annuity figure was computed to be $109,000.

These matters are treated in Edison Exhibits 24, 25 and 27, and are the subject of testimony by the witness Rehberg.

Practically the only criticism leveled at this testimony is the use of a straight in-

stead of a declining annuity rate over the 20-year period.

For reasons above given, it is believed that the former is the more rational formula in connection with these properties. This is particularly so since the Government witness expressed no views concerning the Kent Avenue properties, but only those in the Wallabout Market area.

As to both claims, there are certain of the arguments advanced by the Government upon which comment is deemed to be appropriate.

First: These claimants (it is said) have sought to recover compensation for loss of estimated profits. The case is presently not so understood. The opinion for reversal makes clear that future anticipated profits, as such, have no place in the award. This court was required to reach a conclusion as to whether the apparent loss occasioned by the taking of these properties and franchises in 1941 actually arose in the light of subsequent history, and was instructed not to adjudicate the financial aspect of such loss, until it had satisfied itself whether, on the whole, the results of the taking had been about—or nearly—as helpful to the claimants as harmful.

The only light that can be thrown about that subject is to weigh the probabilities of what would have happened, had the taking not occurred.

That in turn requires the projection of 1940 performance into the foreseeable future, which is presently regarded as 20 years; the former is tangible and substantial and the figures have not been challenged. The latter delimits the zone of conjecture, and the preference which has been expressed will be either approved or disapproved according to the ultimate appraisal to be made of all of the testimony in this case.

Second: The bearing of the stipulation in the Edison case, under which known values of removable property were credited to the condemnor. That subject was discussed in the former opinion of this court, 71 F.Supp. 248, at page 254, and nothing in the opinion for reversal is thought to require reexamination of the subject.

Third: The use of average expenses of the entire systems.

It is not pointed out how better or different accounting methods could have been employed, or what they could be expected to show. This has been referred to above. The subject would not bear further comment except for the citation of United States v. 25.4 Acres of Land, D.C., 71 F. Supp. 255, another phase of this proceeding. Reference was made in that opinion to the segregation by the City of receipts of a substitute facility, but the use of average costs as applied thereto. It was thought that this was not truly informative where recovery was being sought for alleged increased costs of operating a substitute facility, since the actual results as shown by the operating records of the claimant itself did not bear out the computations by the Commissioners.

The factual difference between the two cases seems to be obvious.

The electrical energy which was rendered available into power, at the generating plants of the Edison Company, may be thought of as having been gathered into a pool whence drafts were made by sundry consumer demands. Since it is not possible to label or identify the sources at the outlets, no method other than that involved in the use of average figures to establish costs of production is apparent; this necessarily includes all attendant elements, such as taxes and other charges which must be borne by the current if the results of its marketing are to yield intelligent information in the financial sense. Parallel reasoning applies to the Brooklyn Union Gas Company.

Reference is also made to "individualized" profits referred to in the opinion for reversal in connection with the Chicago, B. & Q. R. Co. v. North Kansas City Development Co., 8 Cir., 134 F.2d 142, at page 154. That in turn quotes from a Missouri case as follows: "The Missouri Supreme Court has held that individualized profits, based upon variable business factors, do not constitute a competent basis for computing the market value of property in condemnation."

It will be remembered (a) that this case does not involve market values of these properties since none could be visualized; (b) that there are no parallel public utilities the performances of which can be com-

pared with those of these claimants to ascertain whether there is here involved the employment of special skills or personal attributes such as might contribute, for instance, to the unique worth of a certain parcel of real estate constituting a business site; and (c) that, in so far as these companies successfully catered to their customers in the areas taken, the intrinsic values of their properties were thereby stabilized. Just why that should be counted against them, I am unable to perceive, unless it be that automatically public utilities are remitted to an inferior status in the matter of the just compensation contemplated by the Fifth Amendment.

The other matters involved in the motion to dismiss are either repetitions of previous arguments which do not survive the decision of the Court of Appeals, or have necessarily been considered in what has been written.

Another expression in the opinion for reversal which has enhanced the difficulty of the present task is the passage, at the foot of page 397 of 168 F.2d: "After all, the nature of the improvement was not shrouded in mystery. There were clear grounds for expecting some development of the kind that actually happened, and evidence of such actual happening is useful to support or check the assumed prospects." The meaning of the latter clause has been sensed and the evidence concerning it has been discussed. It is the import of the first clause that presents the difficulty for which culpability is hereby confessed.

If the meaning is that the war which threatened in 1941 necessarily pointed to the likelihood that these properties would be taken in condemnation, the difficulty of fixing their values at the time is not thereby abated. It could mean, of course, that in 1940 or 1941 it would have been unwise for these claimants or any one else to build these structures in the hope and expectation of operating them under their franchises for any extended period. But they had been built and so operated for many years prior to 1940, and to say that the threat of taking for war purposes rendered them any less valuable than they already were, seems to me, if I may say so within the bounds of entire circumspection, merely to beg the present question.

Since the evidence is all one way and is thought to supply that which was deemed necessary to completion of a proper record, there remains but to say that, while the figures previously adopted could reasonably be increased in light of the testimony taken and the Exhibits filed at the third hearing, to yield to the impulse so awakened might lead to misunderstanding; accordingly the decision will be that the court hereby makes and states the following awards in this proceeding, to these claimants:

To Brooklyn Union Gas Company:
Wallabout tract (No.M–494) .................... $11,963.00
Kent Avenue tract (No.M–586)................. 3,877.00

Total ........................................... $15,840.00

To Consolidated Edison Company:
Wallabout tract (No.M–494) .................. $78,432.00
Less Transformers ................. $5,633.15
Cables, etc. ..................... 750.78   6,383.93   $ 72,048.07

Kent Avenue tract (No.M–586)................ $37,381.00
Less Cables, etc. ............................ 500.52   36,880.48

Total ........................................... $108,928.55

Settle order in accordance with the foregoing.