Keating, J.
(dissenting). When private property is taken for public use, our State and Federal Constitutions alike mandate the payment of “ just compensation ” (N. Y. Const., art. I, § 7; U. S. Const., 5th Arndt.). They do not require the payment of a windfall, nor, in arriving at ‘ ‘ just compensation ’ ’, do they require the courts to ignore the economic and political realities which faced the condemnees in the course of their normal existence during the many years preceding condemnation.
Much as we may sympathize with the plight of an economically unfortunate corporate operation, we may not sweep that misfortune away in a condemnation proceeding by ignoring the causes which gave rise to it.
Our business is to arrive at “ just compensation ”, no more and no less. Elusive as that concept may be at times (see Banner Milling Co. v. State of New York, 240 N. Y. 533, 546) there are, nonetheless, well established guidelines for us to follow.
First, it is axiomatic that the measure of compensation for property taken is the owner’s loss and not the taker’s gain (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195; Kimball Laundry Co. v. United States, 338 U. S. 1, 5; McGovern v. New York, 229 U. S. 363). In its application to this case, this simply means that we must look to the value of what the condemnees have lost and not to the value of what the condemnor has gained.
Second and somewhat corrollary to the above is the rule that the condemnees may not demand an artificial or inflated value based on the public need. This is commonly referred to as “hold-up ” value and it is universally rejected as a measure of compensation (Matter of Simmons, 130 App. Div. 356, affd. 195 N. Y. 573, affd. sub nom. McGovern v. New York, 229 U. S. 363, supra; United States v. Cors, 337 U. S. 325, 333-334). However, this does not mean that the inherent value of the transit systems for public use must be disregarded. The properties here being condemned were, from the beginning, brought into *225 existence by private interests to serve the public need for mass transportation. Tbey served the public need on the date of condemnation and their facilities continue to do so today. To this limited extent they have and always have had a real value to the condemnees, which may be taken into consideration in arriving at a final award. This is clearly distinguishable from an inflated and artificial “hold-up ” value which suddenly comes into being with the announced condemnation.
Thus, we come to the question of how we are to determine value to the condemnees. The usual formula is to determine what a willing buyer would pay to a willing seller in an arms ’ length transaction. Obviously, since every condemnation is, in effect, a forced sale, courts must make an informed judgment upon all the available evidence as to what a hypothetical willing buyer would probably pay to a hypothetical willing seller. This is precisely what the courts below said they were doing and, in fact, did.
The value of the tangible assets, buses, garages, real estate, fixtures and all other euqipment, was considered. A buyer would pay for these and so too must the city.
In addition, there is real value attributable to the fact that these tangible assets are not isolated units. They are fully integrated and operating transit systems, held together by personnel available and working, franchises, operating schedules, established routes, accounting and maintenance records and all of the other elements which spell the difference between ‘ ‘ bare bones ” and a transportation system in operation. These are but elements of a “going concern ” for which a buyer would willingly pay. The city, which took them, must pay for them and has paid for them rather generously. As elements of a business which have value, it is only proper that they should be considered part of the ‘ ‘ just compensation ’ ’ to which the condemnees are entitled and so the case law has consistently held (Kimball Laundry Co. v. United States, 338 U. S. 1, supra; Banner Milling Co. v. State of New York, 240 N. Y. 533, 544, supra; Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 164-165; Omaha v. Omaha Water Co., 218 U. S. 180, 202; Denver v. Denver Union Water Co., 246 U. S. 178, 191).
The majority opinion states (p. 218) that “ The present awqrd is sufficient only as compensation for the valqe of the *226 tangible property taken.” This manifestly cannot be so. The final award as affirmed by the Appellate Division was $30,353,542. The city, on its appeal to this court, claims that the award should not have exceeded $20,700,000.
To the extent that the claimants were integrated, synchronized and functioning operations, they were specifically compensated by Special Term (46 Misc 2d 14, 25). The Appellate Division recognized this (23 A D 2d 463, 467): “ The break-up or ' bare bones ’ value of the physical assets, except perhaps for the real estate, would have been greatly less than the amount fixed by Special Term. Had claimants voluntarily discontinued operations and sought to sell their real estate and personalty, they would have been fortunate to realize the amount which the city on its cross appeals asserts should have been awarded — namely, two thirds of the award”.
There cannot be any doubt but that the Appellate Division, in the exercise of its jurisdiction to review the facts, would not have sustained a $30,353,542 award for the physical assets alone, and there is no basis for our doing so in the first instance.
If we return now to our hypothetical buyer, we must ask, somewhat rhetorically, whether he would pay for something which he did not take, which he did not receive and which, in fact, neither existed nor had a potential for ever coming into existence. This crucial element is the ability to earn money, that most precious commodity which, in all but the case of a philanthropist or a unit of government, brings the buyer into the market place to begin with.
A willing buyer will pay substantial sums for a business which earns money. A business which does not and cannot be brought to the point at which it brings its owner a reasonable return on his investment has no ‘ ‘ earnings ’ ’ element of going-concern value (Matter of City of New York, 265 N. Y. 170, affd. sub nom. Roberts v. New York City, 295 U. S. 264; Kimball Laundry Co. v. United States, 338 U. S. 1, supra) for which a buyer will pay. In such a situation, no good reason appears why the city should have to pay for a non-existent element.
The evidence in this case abundantly establishes that, at the 15 cents fare per passenger, the claimant transit companies were not earning and were not capable of earning money. In 1961, the year preceding condemnation, claimant Fifth Avenue Coach *227 Lines, Inc., had a deficit of $300,000 after taxes and claimant Surface Transit, Inc., liad a net income of $90,000 after taxes. For the three years preceding condemnation, Fifth’s average net income after taxes was $27,000 and Surface’s was $552,000. Average net operating income (pre-taxes) for the 10 years preceding condemnation was $3.2 millions for the two companies combined. These figures include $20 millions in subsidies to supplement the fare box in the seven years preceding condemnation.
In 1962, claimants ’ president wrote to the Board of Estimate that claimants “ are in a serious and critical financial condition. Petitioners in 1961 had a loss of $721,410. The loss for January of 1962 is approximately $500,000. Based upon results thus far this year, petitioners estimate that they will have a loss in 1962, in excess of six million dollars.”
The majority does not dispute these findings of fact made by both courts below. Rather, - they recognize them, but insist, nonetheless, that the city must pay as if there were profits and this is on the theory that claimant's had a right to make a profit (by raising the fare) and that “ had the city not suppressed the earning power of these transit lines by' denying them, for political reasons, the right to charge an increased and reasonable fare, they would have had large gains in gross revenues and greater gains in net profits as- going concerns at the time of condemnation.” (Pp. 220-221.)
In my view, neither of these arguments square with the facts or the applicable law.
We may note that as of this writing, four years after the taking in- question, the transit fare has just been increased from 15 cents to 20 cents. Notwithstanding this recent increase, value in a condemnation proceeding is calculated as of the date of the taking and not as of a future date, four years later.
Political considerations, in this case the pocketbook of the millions of New Yorker’s who use.the transit system daily, are not to be shrugged off lightly. This was a fact of life with which the claimants were required to contend throughout their operating existence. The announcement of condemnation did not herald an end to their burden — at least it should hot with regard to valuation. As Special Term said in respect to claimants’ asserted right to bo valued, at a higher faro: “ The complete *228 answer is that, daring the entire 10-year period while claimants ’ earnings before income taxes average only about $3.2 millions on a business alleged to be worth $92.5 millions, they had whatever right they now contend for, yet they failed to assert it. This must have been because they recognized that they conld not overcome the practical or legal obstacles or both. They have not shown any greater chance of success at this time ” (46 Misc 2d 14, 21).
Moreover, there is not the slightest iota of evidence to establish that the city suppressed the earning ability of these claimants in order to take them over at a lower cost. Just as the city may not depress value in contemplation of condemnation so, too, the claimants may not employ condemnation for the purpose of enhancing their own value (Matter of City of New York [Inwood Hill Park], 230 App. Div. 41, 43-44, 46-47, affd. 256 N. Y. 556).
Among the practical and legal obstacles to increased earnings are the circumstances that: (1) the franchises pursuant to which the claimants operated were nonexclusive and were in direct competition with the city’s transit facilities. 68% of Fifth’s revenues and 62% of Surface’s revenues were from routes competitive with the city’s system and the claimants could not reasonably expect passengers to pay a higher fare on one than on the other; (2) the franchise agreements expressly reserved to the city the right of termination in the event fares were increased without the consent of the Board of Estimate. This alone is enough to prevent the claimants from asserting the right to be valued on the basis of a higher fare; and (3) as I have already noted, even the hypothetical right to a higher fare would not affect the award since it is the condemnees’ earnings on the date of taking, rather than a speculative rate at a speculative date in the future, which are relevant. (Olson v. United States, 292 U. S. 246, 257.)
The claimants’ asserted right to a higher fare in any event seems equally groundless. The ground upon which it is urged is that the city, which controls the fare by virtue of a transfer of jurisdiction to it from the Public Service Commission (Public Service Law, § 5-d), is obligated, as the new regulatory agency, to permit claimants to charge a compensatory fare.
*229 Section 5-d of the Public Service Law provides in relevant part that “ The rates of fare on any such omnibus lines shall be those established pursuant to any contract, franchise or consent heretofore or hereafter made between the omnibus corporations operating such lines and such city ’
It is clear that the Legislature may withdraw the jurisdiction of a regulatory agency and leave the parties to the terms of their franchise agreement (Matter of Village of Mamaroneck v. Public Serv. Comm., 208 App. Div. 330, affd. 238 N. Y. 588) but, in the final analysis, that question is not controlling for, in fact, the claimants never asserted a right to a higher fare prior to condemnation, and they may not do so after condemnation has become a reality. Moreover, the claimants had no right to be free from the city’s competition (Hamilton Gas Light Co. v. Hamilton City, 146 U. S. 258, 268) and the mere fact of regulation did not assure them of the right to mate a profit (Power Comm. v. Hope Gas Co., 320 U. S. 591, 603). The following quote from Market St. Ry. Co. v. Comm. (324 U. S. 548, 567) is relevant: “ [I]t may be safely,.generalized that the due process clause never has been held by this Court to require a commission to fix rates on the present reproduction value of something no one would presently want to reproduce, or on the historical valuation of a property whose history and current financial statements showed the Value no longer to exist, or on an investment after it has vanished, even if once prudently made * * * The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces.” (Emphasis added.)
This, in substance, is the basis for my dissent. In no case that I have found have the. courts required a condemnor to pay for something which was not taken and which did not exist. Condemnation requires “ just compensation ” but “ just ” has reference to condemnor as well as -condemnee.
Where a profitable business is not taken and where it is shown that the business is not reasonably capable of profitable operation by reason of economic forces, no compensation may be allowed therefor (Matter of City of New York, 265 N. Y. 170, affd. sub nom. Roberts v. New York City, 295 U. S. 264, supra; *230 Matter of City of New York [Sixth Ave. El. R. R.], 265 App. Div. 200, 206-207). Of course, in this connection it makes no difference at all that the claimants operated ‘ ‘ the nations two largest privately owned transit systems. ’ ’ They would have been worth more with smaller systems and larger earnings. As Mr. Justice Cardozo said in Roberts v. New York City (supra, p. 282), ‘ ‘ Substantial prices are not paid for the privilege of conducting a business at a loss.”
Since I believe that at $30,353,542 the claimants have already received far in excess of that which they could have reasonably anticipated from a willing purchaser, I think they are entitled to no more for nonexistent profit potential.
Accordingly, I would affirm the orders of the Appellate Division.
Judges Ftjld, Yah Voorhis and Scileppi concur with Judge Burke; Judge KeatiNG dissents in an opinion in which Chief Judge Desmond and Judge Bergan concur.
Order modified and, as so modified, affirmed, with costs to claimants, and case remitted to Special Term for further proceedings in accordance with the opinion herein.